[No. C034403. Third Dist. Apr. 24, 2002.]

THE PEOPLE, Plaintiff and Respondent, v.
BRUCE G., Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts I, II, III and V of the Discussion.

**COUNSEL**

George Bond and Shama H. Mesiwala, under appointments by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Robert R. Anderson and Arnold O. Overoye, Assistant Attorneys General, and David A. Lowe, Deputy Attorney General, for Plaintiff and Respondent.

**OPINION**

**MORRISON, J.**—Defendant Bruce G. was accused by information of four counts of violating Penal Code section 288, subdivision (a) (all undesignated

section references are to the Penal Code). Counts 1 through 3 accused defendant of committing a lewd or lascivious act upon A. II, a child under the age of 14, on or about March of 1997; count 4 accused him of committing a lewd or lascivious act upon C., a child under the age of 14, on or about July 1996.

After trial, a jury convicted defendant on counts 1 through 3 and acquitted him on count 4. Relying on section 1203.066, the trial court denied defendant's application for probation and sentenced him to an aggregate prison term of six years (the midterm on count 1, with concurrent terms on counts 2 and 3).

Defendant contends: (1) The trial court abused its discretion under Evidence Code section 352 by admitting evidence of sexual offenses allegedly perpetrated by defendant against two adult women. (2) The admission of this evidence under Evidence Code section 1108 deprived defendant of due process and a fair trial. (3) The trial court erred prejudicially by instructing the jury with the 1999 version of CALJIC No. 2.50.01. (4) The prosecutor committed *Griffin*[1] error in closing argument. (5) The cumulative effect of these errors and prejudicial acts compels reversal. (6) Defendant's sentence must be vacated because the trial court applied the wrong statute (§ 1203.066) in determining that defendant was ineligible for probation. (7) Defendant's trial counsel was ineffective for failing to object to the court's use of the wrong statute in denying probation.

In the published portion of the opinion, we agree with defendant that the trial court erred in relying on section 1203.066 to deny probation. We shall vacate defendant's sentence and remand the matter so that the trial court may consider defendant's eligibility for probation under the correct statutes. In the unpublished portion of the opinion, we reject defendant's other contentions and affirm his convictions.

FACTS

*Prosecution case*

*Background*

Until the summer of 1996, defendant, his wife (Wife) and their three daughters, A. I, A. II, and C., lived in Sacramento. In 1996, A. I, the oldest daughter, was 10 or 11 years old; A. II was 9 or 10 years old; C. was 7 or 8 years old. Defendant, Wife, and Wife's mother jointly owned a family business.

---

[1] *Griffin v. California* (1965) 380 U.S. 609 [85 S.Ct. 1229, 14 L.Ed.2d 106].

In July 1996, A. II, upset and crying, told her mother in C.'s presence that defendant had made A. II touch him inappropriately. A. II said she "[didn't] want to do that anymore." When Wife asked what she meant, A. II replied: "[W]ashing her dad's private parts in the shower." Wife confronted defendant, who denied wrongdoing.

According to A. II's trial testimony, earlier that day she and C. had been showering together in the bathroom of the master bedroom. A. II had just finished washing C.'s hair and C. had left the shower. As A. II prepared to start washing her own hair, defendant, naked, unexpectedly entered the shower and told A. II to wash his body. He handed her a bar of soap and had her "wash his penis along with the rest of his body." As she did so, his penis became hard. He told her at one point to continue because his penis was not clean enough. She could not recall whether he moved his body or made any sounds as she washed his penis. Afterward, he told her not to tell anyone.[2]

About three weeks later, Wife left the family home and moved to Foresthill;[3] A. II went into counseling. Wife had been reluctant to leave defendant earlier because she loved both defendant and A. II and wanted to believe them both; however, when A. II asked why Wife did not love her and believe her, Wife decided she had to make a choice.

Because divorce proceedings were underway and A. II had reported molestation, the children did not visit defendant without supervision from October 1996 through February 1997. During February 1997, the children began alternate weekend visitation with defendant at the Sacramento home.

*Evidence relating to counts 1-3*

During their visits, according to A. II's testimony, the girls all slept in defendant's bed, which was the only available bed in the house.[4] A. II usually wore a shirt to bed; defendant slept either in underwear or naked.

---

[2]A. II testified that defendant had showered with his daughters when they were little, but he had never told her to wash his penis before. Wife testified that defendant had not showered with his daughters since 1993, three years before this incident (when A. II would have been six or seven years old).

Defendant was not charged with any crime arising from this incident.

[3]Wife's future husband, Earl, was a staffer at the campground the family used there; Wife moved into his trailer after filing for divorce. Wife did not mention these facts on direct examination.

Defendant asserts that Earl lived with the family in the Sacramento residence, but the record does not support him.

[4]There was conflicting evidence about where the girls slept during their visits to defendant's home. In a videotaped interview conducted in May 1997 at the multidisciplinary interview center (MDIC) which was played for the jury, admitted into evidence, and furnished

One night in March 1997, A. II woke up in defendant's bed to find him moving her thumb around his penis; A. II's sisters continued to sleep.[5] His penis was hard and felt as though it had lotion on it. Telling her to be quiet, he directed her into the bathroom. In the bathroom, he grabbed a towel and "did something to his penis that made stuff come out" which was "milky, watery." She said "Eww"; he told her to keep quiet. Then he turned her around to face away from him, placed lotion in her hands, and had her rub it onto his penis with her hands behind her back. Finally, he directed her back to the bedroom and told her to go back to sleep, adding that she should not tell anyone about this incident because if she did he wouldn't be able to see them any more.

In her MDIC interview, A. II said that defendant explained he made her do this only because he had not had a massage in a long time. At trial, she recalled something about a massage, but nothing more specific.[6]

Later in March, around Easter vacation, A. II visited defendant again. As before, A. II woke in defendant's bed, with her sisters still sleeping, to find defendant "making [her] do that." A. II tried to feign sleep as defendant moved her hand on his erect penis. She finally told him she was uncomfortable. He put on clothes and told her not to tell anyone about the incident.

On cross-examination, A. II recalled four incidents, rather than the three she had mentioned on direct. She also recalled that the last two occurred after Easter vacation, but could give no more specific dates.

A. II did not immediately tell Wife what had happened because she still wanted to see defendant and she felt uncomfortable thinking about discussing the incidents with people she did not know. But eventually, just before another scheduled visit to defendant, A. II did tell Wife about the incidents.

---

to this court on appeal, A. II said C. was asleep on the floor when the first incident took place; at trial A. II could not recall whether that was so or whether she had ever said it was. Both A. I and A. II recalled that C. would often go back and forth from the bed to the floor. C. testified that she usually slept on the floor while her sisters slept on the bed. A. I recalled that she sometimes slept on the couch and did not remember sleeping with both sisters on the bed. However, Detective Gernandt, the investigating officer, recalled that A. I told him the girls sometimes all slept in the bed.

[5]In the MDIC interview, A. II gave the date of this incident as March 1, 1997, and the date of the next incident as March 29, 1997.

[6]Dr. Mary Anne Frank, a family therapist and court-appointed mediator in the family law case who was called as a defense witness, testified that according to her notes of an interview with A. II in November 1996, A. II mentioned a "massager" in connection with an alleged molestation.

Wife then had A. II write down what she remembered before Wife confronted defendant and contacted Child Protective Services (CPS).[7]

A. II's writing, which was admitted into evidence as an exhibit, stated in a paragraph dated March 1: "My dad had me rub his private part with my thumb and he put lotion on it." In a paragraph dated March 29, A. II wrote: "My dad had me do the same thing." The writing also included the phrases "The first time he said it's only because he hasn't had a massage in a long time" and " 'Don't tell anyone or I won't be able to see you girls.' "[8]

Wife confronted defendant with A. II's story. According to her, he replied: "Baby, no, no, no, don't go there, no, no, no," "It didn't happen," and "I didn't do that . . . , don't accept that, don't believe that, I wouldn't do that."

*Evidence relating to count 4*

C. testified that one day before her parents separated, she was in the shower alone, preparing to wash her hair, when defendant entered naked and said "Wash this," pointing to his penis. She did so, rubbing her soapy hands together. She said defendant's penis was "down"; the skin was "gross" and "crinkly." She stopped because she did not like doing this. While she was doing it, defendant washed her hair. Afterward C. left the shower, dressed, and went to her room. Not wanting to get in trouble, C. did not tell anyone about the incident until the night in July 1996 when A. II told their mother about her own molestation.

Wife did not recall that C. told her of this incident at that time. As Wife recalled, C. mentioned her alleged molestation for the first time to Dr. Frank, the counselor in the divorce case.

Wife and A. I admitted at trial that C. lies, makes things up, and tells stories. A. I recalled that C. had said nothing happened to her. In her MDIC

---

[7]Wife admitted that she delayed reporting defendant's alleged conduct to CPS, although as a family business operator she is mandated to report such matters. However, she denied telling defendant's mother in July 1996 that she would not go to CPS if defendant gave her the daycare business. She admitted, though, that in August 1996 she and her mother, the third owner of the business, entered into an agreement to eliminate defendant's position as a director.

Wife also admitted that she had allowed the girls to resume unsupervised visitation with defendant although she did not know whether he had completed the counseling ordered by the family law court as a condition of unsupervised visitation.

[8]Another writing by A. II was introduced in evidence. A Christmas list purportedly written in 1997, its first item read: "Dad to admit what he did." Wife testified that she found it among the "divorce papers" only after trial began; she had not mentioned it or shown it to anyone before. A. II authenticated the writing in an Evidence Code section 402 hearing before Wife gave this testimony.

interview, A. II said C. had claimed molestation but that A. II did not know if C. was telling the truth because she lied a lot. In the defense case, Dr. Frank and therapist Alicia Santos-Coy testified that A. I and A. II had made similar statements about C. to them.

### A. I's evidence of uncharged conduct

A. I testified that one day when she was 10 or 11 years old and living in the Sacramento residence, she was in the shower washing her hair, turned around, and saw defendant behind her. He pointed to his penis and said "Wash me." Frightened, she looked down. He grabbed her hand and placed it on the "top of [his penis], the front part," then wrapped her fingers and thumb around it and moved her hand back and forth. His penis became erect. The incident lasted one or two minutes. While it was going on, defendant moved his shoulders back, tilted his head, and rolled his eyes.[9]

A. I did not tell anyone about this incident even after A. II confessed her own molestation, because A. I still loved her father and did not want to make things worse. She disclosed defendant's conduct for the first time in May 1999.[10]

### Other uncharged conduct

Ann Marie, 31 years old at the time of trial, had worked for defendant's and Wife's family business. In 1994, at a housewarming party, Ann Marie was talking with defendant in the backyard of his house. He reached over, took her arm, "jerked" it to his crotch, and placed her hand on top of his jeans on his penis. She jerked it away after about five seconds, then walked away as he smiled at her.

Debbie, 36 years old at the time of trial, worked for defendant and Wife in their family business for over six years. About five years ago, when Debbie was at their house, defendant approached her from behind, started to rub her shoulders, said he was excited, took her hand, and placed it on his groin; she could feel his erect penis. She pulled it away immediately. Defendant and Debbie were completely clothed at the time. She did not consent to his conduct.

### Defense case

Defendant did not testify, but mounted a defense which attacked his daughters' and Wife's credibility. He also sought to prove that Wife had two

---

[9] In the jury's presence A. I testified that she used only the shampoo that was already on her hands. Out of the jury's presence she testified that defendant handed her a bar of soap first.

[10] The information in this case was filed on November 21, 1997. Jury trial began on September 30, 1999.

motives for inspiring the girls to fabricate: she was having an affair with the man she later married, and she wanted to take defendant's share of the day-care business away from him.

Defendant's mother, Sandra, testified that defendant attended a family picnic on Easter Sunday, March 30, 1997 (the day after he allegedly molested A. II during her Easter vacation visit), without his children. Sandra recalled that Wife mentioned defendant's alleged molestation of A. II in a conversation in which Wife also said she was seeing another man and would leave defendant. Wife later said she would not press charges if defendant signed over the daycare business. Finally, Sandra recalled that Wife dropped off a box of defendant's possessions, which included a copy of A. II's 1997 Christmas list.

Defendant's sister Donna, who lived near defendant and Wife and visited them regularly, recalled that they often showered with their daughters and that Wife was always home. She admitted, however, that to her knowledge the joint showers ended well before the summer of 1996.

Lori R., a customer of Wife's family business, testified that from 1994 on, the children were not always tended to at Wife's home as they had been. Wife said someone had reported her to CPS for having too many children in the house and consequently they now had to use numerous locations.

Marilee Napier, a CPS worker, testified that she took Wife's call and wrote a report on or about April 16, 1997.[11] The report stated that according to Wife, on March 1 and March 29, 1997, defendant requested that A. II masturbate him and wash his private area. Wife also stated that the marriage was an "open relationship," and that when a parent was showering, the children could join him or her. Wife did not report abuse of A. I or C.

Detective Gernandt, the investigating officer, testified that he met with A. I and C. on August 26, 1997. A. I denied that defendant had done anything wrong to her, though she knew of something relating to A. II; C. volunteered, however, that when she was seven years old defendant made her wash his penis in the shower and threatened to spank or ground her if she did not comply. Gernandt next met with A. I on December 30, 1998; this time A. I told him of defendant's alleged molestation of her.

Karen M., who looked after defendant's children in defendant's home about seven years ago, became aware then that they sometimes showered

---

[11]Marilee Napier acknowledged that although CPS reports are supposed to be written within 36 hours after CPS has received notice of abuse, this does not always happen.

with him. She also formed the impression that A. II could look you in the eye and lie convincingly.[12]

Dr. Frank, the family court mediator, testified that she had met with family members several times, first in November 1996 and then in May and June 1997. In November 1996, during a meeting with Wife and the girls, Wife, A. II, and C. all described defendant's conduct. Wife recounted a confrontation between herself, defendant, and A. II, in which A. II "backed down" from her allegation against him (possibly meaning only that A. II dropped the subject). Also in November 1996, A. II described two episodes in which defendant told her to wash his penis. Around the same time, C. also described defendant's alleged molestation of her.

In mid-1997, Wife told Dr. Frank that Wife had given unsupervised visitation to defendant without following through on the court's counseling recommendation. Wife also told Dr. Frank of two new incidents of defendant's alleged molestation of A. II. A. II herself told Dr. Frank of those incidents in June 1997. A. II told Dr. Frank, with A. I in the room, that defendant massaged A. II's back with a massager, then asked A. II to massage his "private"; the girls then laughed, giggled, and teased each other. (A. I had just told Dr. Frank that this incident occurred in the afternoon or early evening, but A. II said it occurred at 2:30 a.m.; they giggled after Dr. Frank asked A. II in front of A. I about this discrepancy.)

Dr. Alicia Santos-Coy, a family therapist, testified that she counseled A. II in June 1997. Crying, A. II described a series of incidents of sexual touching involving herself and defendant. In the first incident, when A. II was nine years old, defendant came into the shower when A. II and C. were there and told A. II to help him wash himself, or else go to bed early; when she tried to leave, he stopped her. In the second incident, which occurred when the family was camping, defendant asked A. II to rub his "private part" so he could sleep, then made her do it, and finally told her not to tell anyone.[13] The third and fourth incidents involved defendant making A. II rub lotion on his penis when the girls were visiting him; the first of these times they were all sleeping on the floor, while the second time they were all sleeping on the bed. The first time he took her into the bathroom and "squeezed milky-looking stuff out of him"; the second time she told him she did not want to touch him, but he replied that she had soft hands.

---

[12]On cross-examination, Karen M. admitted she disliked Wife, considered her "very materialistic," and had called her a "con artist." She also admitted that she had no firsthand knowledge of the facts alleged in this case.

[13]A. II told Dr. Santos-Coy that she did not tell Dr. Frank about the camping incident because she remembered it only after leaving Dr. Frank's office.

## DISCUSSION

### I-III*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### IV

Defendant contends the prosecutor committed repeated *Griffin* error in closing argument, irreparably prejudicing him. We disagree.

Defendant cites four comments by the prosecutor as attempts to use defendant's failure to testify against him in violation of *Griffin v. California, supra,* 380 U.S. 609 [85 S.Ct. 1229, 14 L.Ed.2d 106]:

1. "Nobody has even testified for the defense."

2. "And with respect to [A. I] and [C.] and the other women [*sic*], you know that those children sat in this chair and told you the truth. And the thing the defense can't answer, that they never can answer[,] is, they have nothing to gain, . . . And·they didn't want to be here. [¶] They'll never have an answer to that."

3. "But you know it's true because of the corroboration. And when I was thinking about, you know, who's going to tell her. That all referred to . . . the reality, of what happens to people when they come to court. The reality of what happened to [Wife]. [¶] They're all liars. All five of them. [¶] What was the next defense[?] [¶] Sinister plan. Defendant was set up. [¶] Not in so many words, but the bottom line is that—"[14]

4. "It's never been suggested to you that, clearly, the burden is on the prosecution. But the defense pointed to their own diagram and in that diagram didn't say he was innocent. The diagram had [']not proven[']— that's something they wrote in their diagram that does have significance. That's part of the muck. That's part of, like that octopus evading capture. The muck of the defense. [¶] And we have ['Wife] put these kids up to it. [Wife] fabricated evidence. And [A. II] memorized her story.['] And, absolutely, they're not required to prove a darn thing. [¶] But when you prove a

---

*See footnote, *ante,* page 1233.

[14]Defense counsel objected at this point, claiming *Griffin* error as to a "projection" that the prosecutor had apparently set up to illustrate this argument, asserting that the prosecutor had argued that defendant had to prove his innocence, and requesting that the trial court admonish the prosecutor for misconduct. The trial court said: "Yes. The last sentence will have to go out and the jury is admonished to disregard it." The court did not comment on defense counsel's request for an admonition.

defense through cross-examination, the presentation of witnesses, that evidence and the lack—that evidence is subject to the same scrutiny as any other evidence. [¶] Just because they said the same things over and over about those kids and they've talked to mom doesn't mean he's any less guilty. None of that is true. None of that rests on any item of evidence. [¶] The direct evidence that you heard was that he put their hands on the penis —and this isn't commenting only on the evidence, and the state of the evidence is uncontroverted."

To begin with, defense counsel did not object to any of these comments except the third (assuming from the unclear record that that objection went to the prosecutor's remarks and not merely to the visual aid she was using at the time). Therefore, defendant's claim of *Griffin* error is waived except as to that comment. (*People v. Medina* (1995) 11 Cal.4th 694, 756 [47 Cal.Rptr.2d 165, 906 P.2d 2].) Because the trial court sustained counsel's objection and admonished the jury to disregard the objectionable matter, we do not see how it could have prejudiced defendant.

*People v. Hardy* (1992) 2 Cal.4th 86, 154-157 [5 Cal.Rptr.2d 796, 825 P.2d 781], which defendant cites to show that he preserved his claim of error as to all the remarks by objecting to one of them, does not assist him. In *Hardy* an objection and motion for mistrial were raised and argued at the first instance of alleged *Griffin* error, and counsel later renewed their mistrial motions. (*People v. Hardy, supra*, 2 Cal.4th at pp. 156-157.) That is a far cry from the single isolated objection raised here.

But assuming defendant's claim of error is preserved across the board, it fails.

Three of the four remarks he complains of do not constitute *Griffin* error. A prosecutor may fairly comment on the state of the evidence, including a nontestifying defendant's failure to proffer material evidence or witnesses to rebut the People's case. Such comment crosses the *Griffin* line only if the defendant alone could have given such evidence. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1339 [65 Cal.Rptr.2d 145, 939 P.2d 259]; *People v. Medina, supra*, 11 Cal.4th at p. 755.) When read in context, the prosecutor's second, third and fourth remarks here did not cross that line.

The second and third quoted remarks did not even indirectly refer to defendant's failure to testify; they simply asserted the children's credibility.

 The fourth quoted remark, in which the prosecutor described defendant's alleged conduct, then said "the state of the evidence is uncontroverted,"

presents a closer question. It might seem that only defendant could have controverted the children's accounts of what he did, because he was the only other person who could have known what did or did not happen. In context, however, it appears that the prosecutor was commenting on the entire state of the evidence, including the defense efforts to attack the children's credibility through cross-examination, the testimony of Drs. Frank and Santos-Coy, and evidence of Wife's motives to fabricate the charges. Therefore we conclude that this remark was not *Griffin* error.

■ This leaves the first remark: "Nobody has even testified for the defense." Contrary to the People's argument, we believe there is a reasonable likelihood the jury would have understood this remark as a comment on defendant's failure to testify (*People v. Clair* (1992) 2 Cal.4th 629, 663 [7 Cal.Rptr.2d 564, 828 P.2d 705]), because, in fact, the defense had presented various witnesses, including defendant's mother, defendant's sister, a CPS worker, a police detective and a family court mediator. The jury would reasonably construe the remark as an indirect comment on defendant's failure to testify.

However, " 'indirect, brief and mild references to a defendant's failure to testify, without any suggestion that an inference of guilt be drawn therefrom, are uniformly held to constitute harmless error.' " (*People v. Bradford, supra,* 15 Cal.4th 1229, 1340, quoting *People v. Hovey* (1988) 44 Cal.3d 543, 572 [244 Cal.Rptr. 121, 749 P.2d 776].) Such is the case here. The remark in question was a brief, single sentence without amplification. The jury was instructed not to draw any inference of guilt from defendant's exercise of his right not to testify. The prosecutor's remark was harmless beyond a reasonable doubt. (*People v. Mincey* (1992) 2 Cal.4th 408, 447 [6 Cal.Rptr.2d 822, 827 P.2d 388].)

V*

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

VI

Defendant contends the trial court erroneously determined him ineligible for probation under section 1203.066, a statute that requires proof of "substantial sexual conduct," because no such conduct was charged or found true by the jury. Defendant further contends his trial counsel was ineffective for failing to discover and point out the correct law to the court. The People concede these points. We shall accept the People's concessions. ■ Be-

*See footnote, *ante*, page 1233.

cause the trial court misunderstood the scope of its discretion to grant probation, we remand the matter for resentencing.

The parties agree that the trial court relied on section 1203.066 to find defendant ineligible for probation. The court stated it was not prepared to find the grant of probation would be in the best interests of the child, one of the findings necessary to grant probation under section 1203.066, and therefore found defendant ineligible for probation.

As pertinent, section 1203.066 declares a defendant who has engaged in *substantial sexual conduct* with a victim who is under 14 years of age ineligible for probation unless the trial court makes five findings enumerated in the statute.[15]

Subdivision (b) of section 1203.066 provides: " 'Substantial sexual conduct' means penetration of the vagina or rectum of either the victim or the offender by the penis of the other or by any foreign object, oral copulation, or masturbation of either the victim or the offender."

Subdivision (d) of section 1203.066 provides: "The existence of any fact that would make a person ineligible for probation under subdivision (a) shall be alleged in the accusatory pleading and either admitted by the defendant in open court or found to be true by the jury trying the issue of guilt or by the court where guilt is established by plea of guilty or nolo contendere or by trial by the court sitting without a jury."

---

[15]Section 1203.066 provides in relevant part:

"(a) Notwithstanding Section 1203 or any other law, probation shall not be granted to . . . any of the following persons: [¶] . . . [¶]

"*(8) A person who, in violating Section 288 or 288.5, has substantial sexual conduct with a victim who is under 14 years of age. [¶] . . . [¶]*

"*(b) 'Substantial sexual conduct' means penetration of the vagina or rectum of either the victim or the offender by the penis of the other or by any foreign object, oral copulation, or masturbation of either the victim or the offender.*

"(c) Paragraph[] . . . (8) . . . of subdivision (a) shall not apply when the court makes all of the following findings:

"(1) The defendant is the victim's natural parent, . . .

"(2) A grant of probation to the defendant is in the best interest of the child.

"(3) Rehabilitation of the defendant is feasible, the defendant is amenable to undergoing treatment, and the defendant is placed in a recognized treatment program designed to deal with child molestation immediately after the grant of probation . . . .

"(4) The defendant is removed from the household of the victim until the court determines that the best interests of the victim would be served by returning the defendant to the household of the victim. . . .

"(5) There is no threat of physical harm to the child victim if probation is granted. . . . [¶] . . . [¶]

"*(d) The existence of any fact that would make a person ineligible for probation under subdivision (a) shall be alleged in the accusatory pleading and either admitted by the defendant in open court or found to be true by the jury trying the issue of guilt . . . .*" (Italics added.)

The information in this case generally pleaded four counts of violation of section 288, subdivision (a); the information did not plead any facts showing substantial sexual conduct as defined by subdivision (b) of section 1203.066.

The jury's verdict found three violations of section 288, subdivision (a); the verdict did not find any facts constituting "substantial sexual conduct."

The jury's findings that defendant violated section 288, subdivision (a), are not findings that defendant engaged in "substantial sexual conduct" because a violation of section 288 occurs whenever, to gratify the child's or the actor's sexual desires, an actor merely touches a child under the age of 14. (*People v. Memro* (1995) 11 Cal.4th 786, 861 [47 Cal.Rptr.2d 219, 905 P.2d 1305].)

The record in this case demonstrates there was absolutely no compliance with the pleading and finding requirements of subdivision (d) of section 1203.066. Accordingly, section 1203.066 did not apply to limit the trial court's discretion in determining whether to grant defendant probation.

All defendants are eligible for probation, in the discretion of the sentencing court, unless a statute provides otherwise. (*People v. Aubrey* (1998) 65 Cal.App.4th 279, 282 [76 Cal.Rptr.2d 378].) Here, no statute affected defendant's eligibility for probation, although section 1203.067 set forth certain prerequisites to a grant of probation.[16] The trial court had full discretion to grant probation, subject to consideration of the criteria listed in rule 414 of the California Rules of Court.

■ An erroneous understanding by the trial court of its discretionary power is not a true exercise of discretion. (*People v. Aubrey, supra*, 65 Cal.App.4th at p. 282.) "Defendants are entitled to sentencing decisions made in the exercise of the 'informed discretion' of the sentencing court. [Citations.]" (*People v. Belmontes* (1983) 34 Cal.3d 335, 348, fn. 8 [193 Cal.Rptr. 882, 667 P.2d 686].) A court cannot exercise that "informed

---

[16]Section 1203.067 provides in part: "(a) Notwithstanding any other law, before probation may be granted to any person convicted of a felony specified in Section . . . 288, . . . who is eligible for probation, the court shall do all of the following:

"(1) Order the defendant evaluated pursuant to Section 1203.03, or similar evaluation by the county probation department.

"(2) Conduct a hearing at the time of sentencing to determine if probation of the defendant would pose a threat to the victim. The victim shall be notified of the hearing by the prosecuting attorney and given an opportunity to address the court.

"(3) Order any psychiatrist or psychologist appointed pursuant to Section 288.1 to include a consideration of the threat to the victim and the defendant's potential for positive response to treatment in making his or her report to the court. Nothing in this section shall be construed to require the court to order an examination of the victim."

discretion" where it is unaware of the scope of its discretionary powers. (*Ibid.*)

 Here, the court was misinformed as to the scope of its discretionary powers, erroneously believing that section 1203.066 limited that discretion. Where a trial court imposes sentence without an accurate understanding of its sentencing discretion, remand for resentencing is appropriate. (*People v. Rodriguez* (1998) 17 Cal.4th 253, 257 [70 Cal.Rptr.2d 334, 949 P.2d 31]; see also *People v. Sherrick* (1993) 19 Cal.App.4th 657, 661 [24 Cal.Rptr.2d 25] [remand for resentencing where trial court erroneously believed § 1203.066 applied].)

Obviously, a remand for resentencing would be an idle act if it would be an abuse of discretion to grant probation in this case. (See *People v. Warner* (1978) 20 Cal.3d 678 [143 Cal.Rptr. 885, 574 P.2d 1237] [abuse of discretion to grant probation to defendant convicted of oral copulation on a young boy with three prior convictions for similar conduct].) While we express no opinion as to the propriety of granting probation in this case, the record does not indicate that a decision to grant probation would be an abuse of discretion.

In requesting probation, defendant argued he was an intrafamilial regressed molester, not a fixated pedophile, and thus the statutory scheme favored rehabilitation on probation. In support of his request for probation, defendant submitted a psychological evaluation that concluded he was suitable for probation and amenable to treatment, as well as numerous letters of support from family and friends. Unlike the defendant in *People v. Warner, supra,* 20 Cal.3d 678, defendant has no criminal history. In a letter to the court, he expressed remorse and a willingness to do whatever it took to restore his relationship with his daughters. Until these incidents, defendant had a long and stable work history. He worked for 20 years in a family business and 10 years as a correctional officer. He was currently working as a free-lance carpet layer. In short, since there are factors in mitigation, a grant of probation would not be an abuse of discretion. (§ 1203, subd. (b)(3).)

### DISPOSITION

Defendant's convictions are affirmed. Defendant's sentence is vacated and the matter is remanded to the trial court for resentencing in accordance with part VI of this opinion.

Sims, Acting P. J., concurred.

**DAVIS, J.,** Concurring and Dissenting.—I respectfully dissent from that part of my colleagues' opinion remanding the matter to the trial court for resentencing. In all other respects I concur.

A defendant who the jury has found has engaged in substantial sexual conduct with a victim who is under 14 years of age is ineligible for probation unless the trial court makes five findings enumerated in Penal Code section 1203.066, one of which is that a grant of probation to the defendant is in the best interest of the child.[1]

Here the prosecutor blundered by failing to craft the information so as to require the jury to find that defendant had engaged in substantial sexual conduct with a child under the age of 14 within the meaning of Penal Code section 1203.066. Had the prosecutor included the charge, the jury would have necessarily found it true. This is because the facts underlying each of the three counts defendant was convicted of constitute substantial sexual conduct within the meaning of that statute; namely, having his daughter masturbate him when she was 9 or 10 years of age.

At sentencing, the trial court failed to notice the absence of the special finding. It proceeded as if defendant was presumptively ineligible for probation under section 1203.066 and expressly found that a grant of probation to defendant *was not in the best interest of the child*. Probation was denied and defendant was sentenced to prison. Defendant suffered no prejudice because it would be an abuse of discretion to release defendant into the community on a grant of probation.

In deciding whether to grant probation our Supreme Court held in *People v. Warner* that a court is required to exercise discretion that is impartial, guided and controlled by fixed legal principles, exercised with the spirit of the law, and in a manner to subserve and not to impede or defeat the ends of substantial justice.[2] To grant probation here would violate the spirit of the law and established public policy.

Looking through the blurred pane of our appellate record, my colleagues have crafted a sympathetic view of defendant. In doing so, they portray him

---

[1]Penal Code section 1203.066 provides in pertinent part:

"(a) Notwithstanding Section 1203 or any other law, probation shall not be granted to . . . any of the following persons: [¶] . . . [¶]

"(8) A person who, in violating Section 288 or 288.5, has substantial sexual conduct with a victim who is under 14 years of age. [¶] . . . [¶]

"(b) 'Substantial sexual conduct' means penetration of the vagina or rectum of either the victim or the offender by the penis of the other or by any foreign object, oral copulation, or masturbation of either the victim or the offender.

"(c) Paragraph[] . . . (8) . . . of subdivision (a) shall not apply when the court makes all of the following findings: [¶] . . . [¶]

"(2) A grant of probation to the defendant is in the best interest of the child. [¶] . . . [¶]

"(d) The existence of any fact that would make a person ineligible for probation under subdivision (a) shall be alleged in the accusatory pleading and either admitted by the defendant in open court or found to be true by the jury trying the issue of guilt . . . ."

[2]*People v. Warner* (1978) 20 Cal.3d 678, 683 [143 Cal.Rptr. 885, 574 P.2d 1237].

as a suitable candidate for probation and thereby implicitly endorse a discretionary decision to grant probation on remand. This is unfortunate and the trial court will be wise to decline their invitation.

There is simply no difference between defendant's conduct and that of others similarly situated save for the jury's failure to make a redundant finding. Many child abusers, no doubt, have significantly more sympathetic backgrounds than defendant here. Nonetheless, by enacting Penal Code section 1203.066, our Legislature has determined that it is the public policy of this state that when a defendant has a child masturbate him when she is 9 or 10 years of age, he is not suitable for probation *under any circumstances* unless, at a minimum, it is shown that the interest of the victim child is best served by such a grant. The majority's ruling today fails to give proper deference to the Legislature's express determination.

Over an extended period of time and on several different occasions, this 240-pound defendant manipulated his own 9- or 10-year-old daughter into masturbating him despite her objections and then threatened her with the all-too-familiar refrain of telling her to keep quiet or else she would not be able to visit him again. In light of the trial court's determination that it is not in the child's best interest to have defendant released into the community on probation, it would be an abuse of discretion to do so. I would affirm the judgment in its entirety.