Filed 7/18/14  P. v. Luevano CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>SERJIO LUEVANO,<br><br>    Defendant and Appellant. | F065562<br><br>(Super. Ct. No. BF134317A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John R. Brownlee, Judge.

Eileen S. Kotler, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and Eric L. Christoffersen, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

On December 22, 2010, defendant Serjio Luevano was charged with second degree murder (Pen. Code, § 187; count 1)[1] and assault resulting in the death of a child under eight years of age (§ 273ab; count 2). On July 9, 2012, following a jury trial, he was acquitted of second degree murder, convicted of the lesser included offense of involuntary manslaughter (§ 192, subd. (b)), and convicted as charged with respect to count 2. On August 14, 2012, the trial court found defendant ineligible for probation and sentenced him to a term of 25 years to life pursuant to section 273ab, subdivision (a).[2]

On appeal, defendant makes two contentions. First, the trial court failed to sua sponte instruct that the phrase "'beyond a reasonable medical certainty,'" which was mentioned by one of the prosecution's medical experts in his testimony regarding the victim's cause of death, does not equate to a finding of guilty "beyond a reasonable doubt." Second, the court incorrectly ruled that defendant was ineligible for probation on the basis of section 1203, subdivision (e)(3). We conclude the court properly instructed the jury on the prosecution's burden of proving guilt beyond a reasonable doubt, but erroneously determined that defendant was statutorily ineligible for probation. Therefore, we remand the matter for resentencing.

## STATEMENT OF FACTS

### I. Prosecution case-in-chief

On October 11, 2010, at 8:22 p.m., defendant called 911 and reported that his two-month-old daughter Kiera was nonresponsive. Under the direction of the dispatcher, he performed cardiopulmonary resuscitation (CPR) until emergency medical services arrived at his residence in Bakersfield, California. Paramedics diagnosed cardiac arrest,

---

[1]     Unless otherwise indicated, subsequent statutory citations refer to the Penal Code.

[2]     The court also sentenced defendant to the middle term of three years on count 1, which was stayed pursuant to section 654.

administered advanced life support, restored Kiera's pulse, and transported her to Kern Medical Center.

Kiera was transferred to Children's Hospital Central California in Madera, California, on October 12, 2010. That morning, Dr. Adam Holmes, a pediatric intensive care physician, examined her and noted abnormal breathing patterns and other signs of severe brain and neurological dysfunction. Holmes consulted with Dr. Philip Hyden, a pediatrician and medical director of the hospital's Guilds Child Abuse Prevention and Treatment Program. Hyden examined Kiera and agreed with Holmes's findings. By October 13, 2010, Kiera was intubated and needed mechanical ventilation. A computed tomography (CAT) scan of her brain exhibited edema and subdural hematoma. An ophthalmologist also found extensive bilateral retinal hemorrhage. Kiera's blood tests and medical history did not reveal any infections, genetic disorders, blood disorders, or preexisting conditions.

Detectives from the Kern County Sheriff's Office interviewed defendant on October 13, 2010. Defendant recalled that on October 11, 2010, around 5:30 p.m., Brandy Arrellano, his fiancée and Kiera's mother, went to work and left the child in his care. While he was watching television, he rocked Kiera, who was sitting in her baby bouncer, for about an hour. Defendant later picked up the infant and noticed she "didn't wake up" and "didn't startle or nothing." Frightened, he shook Kiera "real hard" more than once "[f]or like a minute or two" to revive her, but to no avail.[3] Defendant attempted CPR, "patted her," "smacked her," and splashed water on her in the bathtub. When Kiera remained nonresponsive, defendant called 911.

On October 15, 2010, after two independent examinations confirmed lack of brain stem reflexes, unassisted respiratory movement, and response to stimuli, Kiera was

---

[3] When the detectives asked whether Kiera's head "snap[ped] back and forth," defendant answered, "Yes it did."

declared brain dead.  On October 17, 2010, her organs were harvested.  The following day, Dr. Thomas Beaver, a forensic pathologist, conducted an autopsy and observed bilateral subdural hematoma and subarachnoid hemorrhage.  He testified that Kiera's subdural hematoma was "caused by mechanical forces applied to small blood vessels in the brain."[4]  In turn, the hematoma "exerted pressure on the brain, causing the arachnoid to hemorrhage beneath it, and then the brain to swell," leading to "a vicious cycle" of increased pressure, swelling, and bleeding.  Beaver highlighted additional evidence of mechanical forces, including cerebral contusions, cerebral edema, and optic nerve sheath hemorrhage.  He opined:

> "[T]his is a death from blunt force trauma to the head, and [the] manner of death is homicide.  [¶] … [¶]  The injuries, the abnormalities to the brain, are all from blunt force.  So there's really no other way that … all those injuries could occur, all those findings could happen without blunt force.  [¶]  And then since I don't have any other explanation, I think it's a homicide, because she didn't do it to herself."

At trial, Hyden described abusive head trauma, also known as shaken baby syndrome:

> "[L]ittle babies don't have neck muscula[ture], which enables them to stabilize their head when there is quick forward and backward movement to the head.  [¶] … [¶]  [A] child can be in the individual's arms and then vigorously, i.e., violently, shaken back and forth so the head is going forward and backward in such a manner that it is causing the brain itself to go backward and forward inside the skull and strike the skull back and forth and cause the gray and white matter inside the brain to tear with violent shaking.

---

[4]     Beaver specified:

"That fibrous capsule that sits on top of the brain, that encloses the brain.  When you apply force to that, … there's movement, and the brain moves relative to the dura and the skull.  And it shears those veins, and then … they bleed and they form blood in that subdural space."

"[The] vessels which are going from a covering over the brain called the dura mater into the brain itself. These are called bridging cerebral veins. [¶] They are also deformed during the shaking back and forth to where they split and tear and cause bleeding into a space, which is not a real space, it's a potential space, which means it doesn't really show in a normal brain unless there's fluid inside of it, and then it fills up. That's called the subdural space. [W]hen this happens, the brain is going back and forth, the blood is released into that space, which usually just indicates that something's happened violently enough to also injure the brain. [¶] … [¶]

"And then when we look at the brain, we can see that [there are] changes in the brain where the gray matter and the white matter start to look almost the same, because there's necrosis going on in the brain, there's lack of oxygen going on in the brain, and then there's swelling going on in the brain, which is called edema. And all that together can make a child not be able to breathe because that swelling causes pressure to be put on the part of the brain that breathes, that controls breathing, which is a respiratory center of the brain stem. And then that can cause the baby to go into what's called cardiopulmonary arrest, depending upon the severity of the shaking."

Hyden added that, in many shaken baby syndrome cases, the victim did not sustain skull fracture or any injuries below the neck.

Concerning bilateral retinal hemorrhage, Hyden remarked:

"They're caused by the same forces, the accelerative, decelerative forces which … are exerted on the head. Amount of force applied to the head, the brain, are the same forces applied to the back of the eye …. [¶] [Y]ou get increased int[ra]ocular pressure, which means pressure inside the eye, … causing more force application by the retina itself, … which is multilayered, and in it are vessels going horizontally and vertically. And this causes them to tear and pull so that you get layers of bleeding or hemorrhaging inside the different layers of the retina, caused by the same extreme forces."

Hyden affirmed that Beaver's autopsy findings, namely subdural hematoma, subarachnoid hemorrhage, cerebral contusions, cerebral edema, and retinal hemorrhage, were "consistent with a violent, abusive shaking." He concluded Kiera sustained "[s]evere abusive head trauma, resulting in death to a reasonable degree of medical certainty."

Dr. Frank Sheridan, a forensic pathologist and chief medical examiner for the County of San Bernardino, commented on the debate in the forensic community over whether shaking alone could result in traumatic head injuries to a child:

> "The so-called shaken baby syndrome, as the term is frequently used, … traditionally has implied the concept of an adult picking up a child and shaking it vigorously backwards and forwards, producing severe and sometimes fatal head injury. [¶] The argument … in the forensic field centers around whether or not that alone can produce fatal injuries. [¶] There are many who say that you can't shake a child to death. You have to do more than that. You have to shake it and hit its head against something.
>
> " … I'm not on either end of the spectrum when it comes to this argument. This is a very heated argument in forensics. You've got people saying absolutely yes and others saying absolutely no. [¶] I think it's possible, definitely, in very small children. Certainly when they get older and heavier, it's not possible. And it's not just the weight, but they get better neck control, which prevents some of the effects of the shaking. [¶] But I do think in very small children, like children in the first few months of life, it is possible."[5]

Sheridan also offered an explanation for the absence of external bruising:

---

[5]     Sheridan later detailed:

> "Children vary in their speed of development. But as a rule of thumb, children under the age of six months do not have very good head control or neck control, and that's why they … can't sit up for several months. They can't—their head will flop because their neck is limp.
>
> "When you, therefore, shake a baby, if you were to shake it violently or put it through any kind of rapid deceleration, we see some of these injuries we're talking about here. [¶] … [¶]
>
> "So if you were going to shake a child like this violently, … the neck does not have the strength to stop the head [from] flopping backwards and forwards. So the head gets subjected to the full extent of the acceleration and the deceleration.
>
> "If you were to try to do that in an older child, say even a year-old child, but older, the child, at that point, has fairly good neck control. And if you were to shake them, … the head wouldn't flop back[ward] and forward so much. The neck would be able to stabilize it to some extent."

"[I]f you do an autopsy on a child who has the other features … like retinal hemorrhage, subdural hemorrhage and brain injury, if you do an autopsy, as I've done many on a child like this, in the majority of the cases you will see evidence of an impact. You'll see it in the form of a bruise in the scalp, typically at the back. [¶] But there are cases, not uncommon[], where you don't see a bruise. In other words, there's no evidence that the child's head was actually hit against something.

"The two possibilities here, one is that, in fact, … the shaking alone was enough to do the damage to the brain. But the alternative[,] and this is supported by various studies … done on either models or other animals, … when you do not find evidence of an impact is that there was an impact, but it was against something relatively soft, something padded, such as, for example, … the back of a sofa or something like that. [¶] … [¶]

" … When I see cases that have all the other features of shaken baby syndrome but don't have an impact, … I'm not sure. In any given case I'm not necessarily sure. But either they are simply being shaken to death or they've been shaken and slammed against something soft. So it does not leave an actual impact, but it does cause enough [gravitational] forces to damage the brain."

Sheridan reviewed and agreed with Beaver's autopsy findings:

"The combination of findings in this child, the subdural hemorrhage with small amount of associated subarachnoid hemorrhage …. [¶] That, in combination with … the severe type of retinal hemorrhage we have here, plus the fact the child presented neurologically damaged and, in fact, comatose. That combination of things indicates an acceleration/deceleration injury. It doesn't … absolutely have to be an abusive one, but that combination is indicative of an acceleration/deceleration phenomenon.

"[I]n this case there was no history of a major traumatic event just before the child was brought to the hospital. There was also no sign of an impact in the scalp, which with an accidental one you would expect. Pretty much every case of accidental head trauma is going to have an impact on the head, a physical impact.

"So putting all that together, I believe, first and foremost, it's an acceleration/deceleration injury. [¶] … [¶]

"Basically, the child was shaken violently and possibly impacted against something that was soft enough not to leave an impact bruise. [¶]

7.

But given the fact that we're talking about a very small child here, a two-month-old, approximately, this is the kind of case that if there is such a thing as pure shaking, … this is the size of the child where it will happen. The age and size. [¶] So … to reiterate, either the child was shaken very violently and that was all there was to it or shaken violently and then slammed against some surface that was relatively soft."

## II.    Defense case-in-chief

Dr. John Plunkett, a general and forensic pathologist, testified that shaken baby syndrome, which was first coined in the early 1970's, was derived from misinterpretation of studies testing the effects of whiplash on the brain.  In the late 1980's, experiments conducted at the University of Pennsylvania established that "a human being simply cannot attain a level of force required to cause brain injury by shaking":

> "[T]he fastest that you can shake a ten-pound model is about three or four times a second back and forth.  [¶]  And in order to exceed any established injury threshold, you need to shake at about nine to eleven times per second.  [¶]  So it's just purely a study of motion and it doesn't really matter whether you're shaking a doll or a model or a chimpanzee or whatever.  [Y]ou're just looking at how fast back and forth it will go with various neck hinges from a stiff rod-like hinge to one that looks like a hinge on a door."

Plunkett pointed out that the University of Pennsylvania experiments also established the need for an impact and listed common physical signs:

> "[T]ypically, not always, … by that I mean 90, 95 percent of the time, if someone has an impact against an object, even a carpeted floor, you're going to see evidence for a bruise.  Not necessarily [o]n the outside, but if someone dies you're going to see evidence for it on the inside of the scalp….  [¶] … [¶]  You're going to see bruising [o]n the scalp on the part of the scalp that's right next to the skull itself.  [I]t's very easy to see.  You may not see it from the outside in part because the … hair gets in the way of your ability to see it.  But you will see it on the inside.  [¶] … [¶]

> "If you were to shake somebody with anywhere near a frequency that would be capable of causing brain damage, you'd have to exert a similar force to the chest.  Might be a hundred pounds, might be 200 pounds, whatever it happens to be.  [¶]  And if you're exerting a 200-pound force or a 100-pound force to the chest of a two-month-old, you're going to crush the chest.  It's just like having a hundred-pound person stand

8.

on the chest of a two-month-old baby who's on the floor[.]  [¶] … [¶]  If you are going to exert a force that is anywhere near the force required to cause brain injury, you're going to cause things like skull fractures."

Plunkett reviewed Beaver's autopsy findings and did not observe any evidence of cerebral contusions or impact.

Based on his assessment of the medical file, Plunkett opined that shaking did not contribute to Kiera's injuries.  He identified other possible causes, including superficial cortical vein thrombosis, spontaneous subdural bleeding, central sleep apnea, or late onset vitamin K deficiency.[6]  Plunkett concluded, "I think the cause of death … is something equivalent to a closed head injury ….  [¶] … [¶]  In terms of manner of death, I would list it as being undetermined.  I can't tell."

Arrellano testified that defendant loved and cared for Kiera.  On one occasion, Kiera stopped breathing following a bath.  Arrellano "smacked [Kiera's] back" and the child "caught her breath." Arrellano denied telling law enforcement on May 9, 2010, that defendant assaulted her.

Angelica Luevano, defendant's sister, testified that defendant was an affectionate father.  Elizabeth Luevano, defendant's aunt, testified that defendant and Kiera were happy.

### III.    Prosecution rebuttal

Christopher Wong, a deputy with the Kern County Sheriff's Office, testified that he was dispatched to defendant's residence on May 9, 2010, in response to a domestic violence call.  At the scene, Arrellano, who was pregnant, told Wong that defendant "grabbed a folding chair or table and struck her once in the head and also once in the left arm" and "grabbed her by her hair and shoved her face into a couch."  Wong did not observe any visible injuries.

---

**6**    Both Hyden and Sheridan rejected Plunkett's alternative diagnoses.

9.

## DISCUSSION

**I.  The trial court properly instructed the jury on the prosecution's burden of proving guilt beyond a reasonable doubt.**

**a.  *Background***

After close of evidence, the trial court read the following instructions to the jury:

> "CALCRIM [No.] 220.  The fact that a criminal charge has been filed against the defendant is not evidence that the charge is true.  You must not be biased against the defendant just because he has been arrested, charged with a crime or brought to trial.

> "A defendant in a criminal case is presumed to be innocent.  This presumption requires that the People prove a defendant guilty beyond a reasonable doubt.  Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt.

> "Proof beyond a reasonable doubt is proof that … leaves you with an abiding conviction that the charge is true.  The evidence need not eliminate all possible doubt, because everything in life is open to some possible or imaginary doubt.

> "In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all of the evidence that was received throughout the entire trial.

> "Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty."

> "CALCRIM [No.] 332.  Witnesses were allowed to testify as experts and to give opinions.  You must consider the opinions but you are not required to accept them as true or correct.  The meaning and importance of any opinion are for you to decide.  In evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally, which I just gave you.[7]

---

**7**  Earlier, the court instructed:

> "You, alone, must judge the credibility or the believability of witnesses.  In deciding whether testimony is true and accurate, use your common sense and experience.  You must judge the testimony of each

10.

"In addition, consider the expert's knowledge, skill, experience, training and education, the reason the expert gave for any opinion and the facts or information on which the expert relied in reaching that opinion.

"You must decide whether the information on which the expert relied was true and accurate. You may disregard any opinion that you find unbelievable, unreasonable or unsupported by the evidence. [¶] … [¶]

"If the expert witnesses disagree with one another, you should weigh each opinion against the others. You should examine the reasons given for each opinion and the facts or other matters on which the witnesses relied. You may also compare the expert's qualifications."

**b.** *Analysis*

"California law imposes a duty on the trial court to instruct the jury in a criminal

case on the presumption of innocence in favor of the defendant and the prosecution's

---

witness by the same standard, setting aside any bias or prejudice you may have.

"You may believe all, part or none of any witness's testimony. Consider the testimony of each witness and decide how much of it you believe.

"In evaluating a witness's testimony, you may consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony.

"Among the factors you may consider are the following: How well could the witness see, hear or otherwise perceive the things about which the witness testified; how well was the witness able to remember and describe what happened; what was the witness's behavior while testifying; did the witness understand the questions and answer them directly; was the witness's testimony influenced by a factor such as bias or prejudice, a personal relationship with someone involved in the case or a personal interest in how the case is decided; what was the witness's attitude about the case or about testifying; did the witness make a statement in the past that is consistent or inconsistent with his or her testimony; how reasonable is the testimony when you consider all the other evidence in the case; did other evidence prove or disprove any fact about which the witness testified; has the witness engaged in other conduct that reflects on his or her believability."

11.

burden of proving guilt beyond reasonable doubt." (*People v. Aranda* (2012) 55 Cal.4th 342, 352 (*Aranda*); see *People v. Runnion* (1994) 30 Cal.App.4th 852, 855, quoting *In re Winship* (1970) 397 U.S. 358, 364 ["Due process 'protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.'"].) "The prosecution's burden of proof in a criminal case is controlled by section 1096 of the Penal Code" (*Aranda*, *supra*, at p. 353, fn. omitted), which states:

> "A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his or her guilt is satisfactorily shown, he or she is entitled to an acquittal, but the effect of this presumption is only to place upon the state the burden of proving him or her guilty beyond a reasonable doubt. Reasonable doubt is defined as follows: 'It is not a mere possible doubt; because everything relating to human affairs is open to some possible or imaginary doubt. It is that state of the case, which, after the entire comparison and consideration of all the evidence, leaves the minds of jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge.'"
> (§ 1096.)

"In charging a jury, the court may read to the jury Section 1096, and no further instruction on the subject of the presumption of innocence or defining reasonable doubt need be given." (§ 1096a.)

In the instant case, the trial court read CALCRIM No. 220 verbatim. "[T]he substance of [section 1096] has … been incorporated into the standard reasonable doubt instructions, CALJIC No. 2.90 and CALCRIM No. 220. Tracking the language of section 1096, the standard instructions describe the presumption of innocence and the requirement of proof beyond a reasonable doubt, and provide the legislatively approved definition of reasonable doubt. A court satisfies its statutory obligation to instruct on these principles by giving CALJIC No. 2.90 or CALCRIM No. 220." (*Aranda*, *supra*, 55 Cal.4th at p. 353, fn. omitted.) "With respect to the principles that a defendant is accorded the presumption of innocence and the prosecution bears the burden of proving

guilt beyond a reasonable doubt, instruction with CALJIC No. 290 or CALCRIM No. 220 also satisfies the long-established rule requiring sua sponte instruction on 'those principles closely and openly connected with the facts before the court, and … necessary for the jury's understanding of the case.' [Citation.]" (*Id.* at p. 354.) Thus, in view of *Aranda*, we conclude the court fulfilled its statutory duty to instruct the jury on the prosecution's burden of proving guilt beyond a reasonable doubt.

Defendant claims the court was required to sua sponte "modify CALCRIM No. 220 to inform the jury that the phrase 'to a reasonable medical certainty['] was not the same as [']beyond a reasonable doubt'" because "the jury likely believed … ['to a] reasonable medical certainty['] equaled [']beyond a reasonable doubt[']" and, "[w]ithout this clarification, the jury could not understand the import of Dr. Hyden's opinion on the ultimate issue in this case." We cannot countenance this assertion. "Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language." (*People v. Andrews* (1989) 49 Cal.3d 200, 218; see *People v. Lawrence* (2009) 177 Cal.App.4th 547, 553-554, fn. 11 [distinguishing between claim that challenged instructions not "'correct in law'" and claim that such instructions were "merely incomplete"].) Defendant admits he did not request clarification or amplification of CALCRIM No. 220 below. As a result, he forfeited the issue.[8]

---

[8] Alternatively, defendant claims he received ineffective assistance of counsel because his attorney failed to request clarification or amplification of CALCRIM No. 220. (See generally *Strickland v. Washington* (1984) 466 U.S. 668.) We reject this contention. (See *People v. Scott* (1997) 15 Cal.4th 1188, 1212 ["If the record does not shed light on why counsel acted or failed to act in the challenged manner, we must reject the claim on appeal unless counsel was asked for and failed to provide a satisfactory explanation, or there simply can be no satisfactory explanation."]; see also *People v. Jones* (2003) 29 Cal.4th 1229, 1254 ["''there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance'''"].)

13.

## II. The trial court erroneously determined that defendant was statutorily ineligible for probation.

### a. *Background*

In a report dated July 31, 2012, the probation officer identified defendant's "limited record of prior criminal conduct" as a circumstance in mitigation and Kiera's vulnerability "in that she was only two months of age" as a circumstance in aggravation. He further detailed:

> "Probation Eligibility:  [¶]  The defendant is statutorily ineligible for a grant of felony probation, except in unusual circumstances, pursuant to [section] 1203[, subdivision ](e)(3), in that the defendant inflicted injury on the victim resulting in death.  Upon review of [California] Rule[s] of Court[, rule] 4.413, this case will not be cited as unusual.

> "Probation Suitability:  [¶]  The defendant is considered unsuitable for a grant of felony probation.  In the instant matter, the defendant violently shook the two-month-old infant allowing the head to snap back and forth thereby causing catastrophic brain injury resulting in the death of the infant.  Common sense would inform the average person that to allow an infant's head to snap back and forth would be extremely dangerous to the infant and could cause significant injury.  Given the above and the tragic results of the defendant's action, a grant of probation would be inappropriate and would significantly depreciate the seriousness of the crime.

> "Sentencing Justification:  [¶]  As Count Two, [section] 273ab carries the greater term of imprisonment, it will be the principal term in this case.  [¶] … [¶]

> "It is respectfully recommended that probation be denied and the defendant be sentenced to the Department of Corrections for the term prescribed by law of 25 years to Life."

---

As for defendant's concern that the jury "could not understand the import of Dr. Hyden's opinion on the ultimate issue in this case," we believe the trial court fully addressed the matter by reading CALCRIM No. 332.  (See § 1127b.)

Lastly, because we do not find any instructional error, we need not address the issue of prejudice.

14.

Defendant filed a statement in mitigation on August 8, 2012, challenging the finding that he was statutorily ineligible for probation.

On August 14, 2012, the trial court, after considering the probation officer's report and defendant's statement in mitigation, concluded:

> "[Defendant]'s ineligible for a grant of felony probation except in unusual circumstances, pursuant to [section] 1203[, subdivision ](e)(3) of the Penal Code. [¶] However, upon review of [California] Rule[s] of Court[, rule] 4.413, this case will not be cited as unusual.

> "[D]efendant is considered unsuitable for a grant of felony probation, because in the instant matter the defendant violently shook a two-month-old infant, allowing the head to snap back and forth causing catastrophic brain injury, resulting in death to the infant.

> "It seems that the average person would know that allowing the infant's head to snap back and forth would be extremely dangerous to the infant and could cause significant injuries, obviously, cause[d] significant tragic results in this case, and a grant of probation would be inappropriate, would significantly depreciate the seriousness of the crime. [¶] … [¶]

> "As a result the Court sentences defendant as follows: As to Count 2, a violation of Penal Code Section 273ab, probation will be denied, and the defendant will be sentenced to the Department of Corrections for the term prescribed by law of 25 years to life."

**b.** *Analysis*

"Probation is generally reserved for convicted criminals whose conditional release into society poses minimal risk to public safety and promotes rehabilitation." (*People v. Welch* (1993) 5 Cal.4th 228, 233.) "All defendants are eligible for probation, in the discretion of the sentencing court, unless a statute provides otherwise." (*People v. Bruce G.* (2002) 97 Cal.App.4th 1233, 1247.) Probation is "absolutely unavailable as a sentencing choice in many serious felony cases and presumptively unavailable in others unless 'unusual' circumstances are present and the 'interests of justice' are best served thereby." (*People v. Welch*, *supra*, at p. 233.)

"A defendant is presumptively ineligible for probation under section 1203, subdivision (e)(3), if he or she '*willfully* inflicted great bodily injury or torture in the perpetration of the crime [of which he or she has been convicted].'" (*People v. Lewis* (2004) 120 Cal.App.4th 837, 852, italics added; see *People v. Aubrey* (1998) 65 Cal.App.4th 279, 282.) "The word 'willfully' as generally used in the law is a synonym for 'intentionally,' i.e., the defendant intended to do the act proscribed by the penal statute. Section 1203, subdivision (e)(3), so read requires the defendant *intentionally* inflicted great bodily injury or torture in the commission of the crime." (*People v. Lewis*, *supra*, at p. 852.)

We find the trial court erroneously determined that defendant was ineligible for probation on the basis of section 1203, subdivision (e)(3). In the instant case, the jury acquitted him of second degree murder. In other words, it could not find that defendant either "'manifested a deliberate intention to take away the life of a fellow creature'" (*People v. Knoller* (2007) 41 Cal.4th 139, 151) or "acted with conscious disregard of the danger to human life" (*id.* at p. 156). Instead, he was convicted of offenses whose mens rea do not trigger the statute's presumption of ineligibility: (1) involuntary manslaughter (see *People v. Brito* (1991) 232 Cal.App.3d 316, 321, fn. 4 ["An essential distinction between second degree murder based on implied malice and involuntary manslaughter based on criminal negligence, is that in the former the defendant subjectively realized the risk to human life created by his conduct, whereas in the latter the defendant's conduct objectively endangered life, but he did not subjectively realize the risk."]); and (2) assault resulting in the death of a child under eight years of age (see *People v. Wyatt* (2010) 48 Cal.4th 776, 781 ["[A] defendant may be guilty of an assault within the meaning of section 273ab if he acts with awareness of facts that would lead a reasonable person to realize that great bodily injury would directly, naturally, and probably result from his act. [Citation.] The defendant, however, need not know or be subjectively aware that his act is capable of causing great bodily injury. [Citation.] This means the requisite mens rea

16.

may be found even when the defendant honestly believes his act is not likely to result in such injury."]).

The Attorney General concedes the trial court erroneously declared defendant statutorily ineligible for probation, but nevertheless argues that remand for resentencing is unnecessary. We disagree. "[W]hen … the sentencing court bases its determination to deny probation in significant part upon an erroneous impression of the defendant's *legal* status, fundamental fairness requires that the defendant be afforded a new hearing and 'an informed, intelligent and just decision' on the basis of the facts." (*People v. Ruiz* (1975) 14 Cal.3d 163, 168; cf. *People v. Alvarez* (2002) 95 Cal.App.4th 403, 407, 409; *People v. Manriquez* (1991) 235 Cal.App.3d 1614, 1620.) Therefore, we remand the matter for resentencing.

## DISPOSITION

The trial court's determination that defendant was not eligible for probation is set aside and the matter is remanded for resentencing. In all other respects, the judgment is affirmed.

_____

Kane, J.

WE CONCUR:


_____

Hill, P.J.


_____

Gomes, J.

17.