[No. D040806. Fourth Dist., Div. One. July 19, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN LEWIS, JR., Defendant and Appellant.

**COUNSEL**

Michael B. McPartland, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Raquel M. Gonzalez and Quisteen S. Shum, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BENKE, Acting P. J.**—After a first trial at which the jury was unable to reach a verdict, defendant John Lewis, Jr., was retried and convicted of assaulting a child with force likely to produce great bodily injury resulting in death within the meaning of Penal Code,[1] section 273ab. Lewis was sentenced to a term of 25 years to life. He appeals, arguing the trial court erred in failing to instruct sua sponte concerning accomplice testimony and in concluding appellant was presumptively ineligible for probation. Additionally, he argues his 25-years-to-life prison term is cruel and unusual punishment.

## FACTS

### A. Prosecution Case

#### 1. The Day Before

On January 2, 2001, appellant, his wife Tricia and their children, two-year-old Jalen and four-month-old Jace, were living in an apartment in the Carmel Mountain area of San Diego County. On that date Tricia, who had been staying home for several months on maternity leave, went back to work. About 2:30 in the afternoon Tricia came home and appellant left for his job. As Tricia was changing Jace's diaper, she noticed his scrotum was swollen and there were two red marks on his thigh. She decided to take Jace to the hospital. She called appellant and he returned home.

At approximately 10:40 p.m. a nurse in the emergency room noticed Jace's testicles were swollen, dark red, hard and touching them caused the child pain. When a physician examined Jace 40 minutes later, the foreskin on the child's penis was slightly swollen and there were minor abrasions on his scrotum. Jace's testicles were not red or swollen and touching them did not cause him pain. The child was not in distress and a neurological examination showed no abnormalities. A second physician examined Jace and made the same findings. Tricia took Jace home.

#### 2. Jace in Distress

About 5:45 a.m. the next morning, Tricia left for work. At 1:08 that afternoon appellant called 911 and reported Jace had slipped in the tub, went

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

into the water and was not breathing. At the direction of the 911 operator, appellant performed CPR on the child.

Police Officer Charles Delacruz arrived at appellant's apartment at approximately 1:14 p.m. When appellant responded to the officer's knocking, he was crying and sweating. His clothes and arms were dry. Delacruz noticed Jace on the floor in the living room. The child was not breathing and had no pulse. Jace's right temple was slightly wet but his hair and body were dry. The carpet under him was also dry.

When the officer asked what happened, appellant told him he gave Jace a bath in the infant tub in the bathroom. Appellant stated he was going to dry the child but discovered there was no towel in the bathroom. After looking first in the bedroom, he eventually found a towel in the kitchen. When he returned, Jace's head was partially submerged with his mouth and nose under water. When his head was taken out of the water, the child gasped and stopped breathing. Appellant stated he then called 911. Appellant said while he was bathing Jace, Jalen was in another room watching television.

As Delacruz administered aid to Jace, he noticed a red mark on the side of the child's neck and two red marks on the inner portion of Jace's left thigh about two inches from the child's scrotum.

Firefighters and paramedics soon arrived at the apartment. A fire captain asked appellant what happened. Appellant, who was agitated and emotionally upset, gave accounts with conflicting details. In one, he stated Jalen was playing with Jace while appellant went to get a towel. In another, appellant stated Jalen was watching television while appellant gave Jace a bath. The captain noticed Jace was dry. There was one television on inside the house. It was located in the master bedroom and was tuned to ESPN. It seemed odd to the captain that a child of Jalen's age would be watching a program on that network.

Appellant told paramedics he was giving Jace a bath and he left Jace with Jalen for about five minutes while he went for a towel. When he returned he found Jace underwater.

The paramedic noted Jace was not breathing, had no pulse and his pupils were fixed and dilated. There was no moisture on Jace or on the floor and the only symptom of drowning was the child was not breathing. Jace was transported to the hospital.

In the bathroom an officer found an infant bathtub propped against the sink cabinet. In the adult bathtub there was a small amount of water around the drain. The rest of the tub was dry. There was no water in the infant bathtub. There were several towels hanging in the bathroom.

### 3. Jace at the Hospital

On arrival at the hospital Jace was still not breathing and had no pulse. His condition was inconsistent with drowning. Various tubes inserted into the child produced bloody fluids—a symptom of trauma. The medical staff also noticed a one-inch by three-inch bruise on Jace's abdomen. Appellant told a nurse Jace was playing in the bathtub while he went for towels but he did not know how long he was gone.

When Tricia arrived at the hospital she was distraught. Police detectives separately interviewed her and appellant. Tricia stated Jace had been "fussy." She told the officer about Jace's swollen testicles and that she had taken him to the hospital the day before.

Appellant told a detective he gave Jace a bath while Jalen was watching television in the master bedroom. Appellant needed a towel but the only one in the room was Jalen's. With Jace in the tub, he left the bathroom to get a towel. He first checked on Jalen and then found a towel in the kitchen laundry hamper. When he returned to the bathroom, Jalen was looking into the tub. Jace had slipped into the tub and was lying on his side. Appellant took Jace to the living room, pushed on the child to get water out of him and called 911.

After ending the interview, the detective learned Jace had retinal hemorrhaging and reinterviewed appellant. Appellant recounted a relatively unremarkable day with his sons. He essentially repeated the facts concerning Jace's bath but added after he picked up the child, he emptied the water from the infant tub into the adult tub. When asked about Jace's health, appellant stated on January 2 he was playing with his sons, holding Jace like a football and chasing Jalen. Appellant stumbled and as he fell, he grabbed Jace's crotch. Jace did not hit his head because he fell on appellant. After the fall Jace's testicles were swollen and he was sleepy and fussy.

The medical staff was able to restore Jace's heartbeat. That afternoon a physician transported Jace to Children's Hospital. The doctor noted Jace had a swollen scrotum and faint bruising on his abdomen which looked like finger marks. Jace's condition was not consistent with a drowning. The child's

pupils were fixed and dilated, indicating a severe brain injury. The soft spot on the top of his head was bulging and tense, indicating a swelling of the brain. Jace had retinal hemorrhages in both eyes and no fluid in his lungs. The doctor concluded Jace had been shaken.

At Children's Hospital radiological tests showed Jace had three healing and one acute rib fractures, i.e, one of the fractures showed no signs of healing. The sutures in the child's skull were abnormally wide as the result of chronic intracranial pressure caused by old bleeding. There were large acute, i.e., hours to days old, and chronic, i.e., weeks to months old, subdural hematomas and acute subarachnoid hemorrhaging. This group of findings indicates nonaccidential trauma and, specifically, shaken baby syndrome.

On January 3 around 8:05 p.m. police detectives again interviewed appellant. Appellant related the events of the day. While appellant and the boys were in the bedroom watching television, he decided to give Jace a bath. He turned on the television to one of Jalen's favorite programs. He left Jalen in the bedroom and took Jace to the bathroom. He bathed the child and washed his hair. He left the room looking for a towel. Appellant explained there were towels in the bathroom but they were dirty. When he returned, Jalen was in the room pointing at the tub. Appellant looked and saw Jace's face partially submerged in the bath water. He grabbed Jace. He dumped the water to keep Jalen out of it. He turned Jace over and with his hand on the child's stomach, he breathed several times into his mouth. He then called 911.

Appellant told the officers on January 2 he was running while holding Jace like a football. As he fell, he grabbed the child's groin area and afterwards Jace's scrotum was red. Appellant also stated when he took Jace from the tub, he shook the child in an effort to revive him. He had not shaken him before.

### 4. *Jace Dies*

Jace died on January 4, 2001. An autopsy revealed numerous abrasions and bruises on his body. Jace had three old rib fractures and one acute rib fracture. There were old and new retinal hemorrhages. There was a large quantity of fresh blood in the skull. The nature of the blood indicated Jace had a one- to three-month-old subdural hematoma and two acute hematomas. The fresh blood was not the result of a rebleeding of an old hematoma and evidenced a new injury. The child also had an acute and an old subdural hematoma around his spinal cord and acute subdural bleeding in the bowl area at the base of his skull. The subdural hemorrhaging was caused by trauma. The autopsy revealed Jace had extensive subarachnoid hemorrhages on the right side of his brain and less extensive subarachnoid hemorrhages on the left side. The right side hemorrhage was caused by the brain hitting the skull.

Jace also had traumatic axonal injuries, i.e., injuries to brain cells, caused by severe shearing, rotational forces on his brain. Those injuries occurred close to the time appellant made his 911 call. The injury would have rendered the child unconscious within minutes.

None of Jace's injuries were caused by a drowning.

The autopsy findings were typical for inflicted trauma. The cause of Jace's death was blunt force head injuries. The primary injury causing death was the traumatic axonal injury.

The prosecution offered the testimony of additional medical experts who explained the nature of shaken baby syndrome and agreed with the autopsy report concerning the nature of Jace's injuries, their timing and the cause of his death. The experts concluded Jace had been violently shaken on at least two occasions, one at least 10 days before November 2, 2000, when an X-ray study had been done of Jace for a different disorder, and the other within hours of his arrival at the hospital on January 3. The experts further concluded Jace's injuries could not have been the result of his fall on January 2 when being carried by appellant.

### 5. *Additional Evidence*

After Jace was taken to the hospital, officers found six towels and four washcloths in the bathroom. One washcloth was wet. There were two wet infant shirts in the house. One had the distinct odor of wet blood. There was a soiled diaper in the middle of the living room. There were several ice trays in the kitchen sink. There were several water spots on the floor near the refrigerator and laundry room. The trash can contained a very wet plastic baggie with faint red stains on it.

Jace's DNA was found on the two wet infant shirts and on the wet plastic baggie.

A psychologist who evaluated and treated Tricia after Jace's death concluded she did not lack impulse controls and was not predisposed to harm her children.

Appellant's testimony from the first trial was read to the jury. Appellant's recounting of events was much like what he related in his various interviews. However, appellant testified that when he fell on January 2 while carrying Jace, the full force of his body landed on Jace. Appellant stated on January 2 he saw bloody urine in Jace's diaper and Jace vomited a brown mucus-like

substance on both January 2 and 3. Appellant did not know how Jace's blood got on the baby shirts or on the plastic bag.

### B.  *Defense Case*

Appellant's defense was that Jace suffered a serious brain injury in October 2000 caused by Tricia. When appellant fell with Jace on January 2, 2001, damaged vessels in the child's head began to rebleed, and this along with the existing subdural hematomas caused his death.

Jerlene Lewis, appellant's mother and a licensed vocational nurse, testified that in mid-October 2000 Tricia told her she was concerned because Jace had fallen off a couch. Jerlene noticed over the next several months Jace's head seemed enlarged and he did not behave in manner she would expect of a child his age.

The defense offered medical experts who concluded Jace's old head injuries had been very severe and a short fall from a couch like the one he suffered in October 2000 could have caused them. The doctors also stated there was evidence suggesting Jace had been bleeding 24 to 48 hours before he arrived at the emergency room on January 3. Appellant's reported fall with Jace occurred during that time period. The new bleeding could have culminated in Jace's physical distress on January 3 and his eventual death. The doctors testified it was possible the extensive axonal damage found in Jace was not the result of severe shaking but rather the result of an oxygen deficiency. The doctors also did not believe the axonal injuries necessarily occurred within an hour of Jace arriving at the emergency room. While Jace had extensive old and new retinal hemorrhaging, it was not necessarily the result of being shaken.

After Jace's death Jalen was placed in the care of his grandparents. On the order of the juvenile court, a psychologist evaluated Tricia on February 31, 2001. The psychologist concluded there were serious questions concerning Tricia's judgment, she was extremely immature and she had poor insight into her anger. The doctor recommended Tricia not be immediately reunited with Jalen in part because it was unclear who had inflicted the earlier injuries on Jace.

A defense psychologist evaluated appellant. He found appellant had a relatively stable emotional profile with nothing indicating he was a potential child abuser.

## DISCUSSION

### A. *Instructions on Accomplice Testimony*

Appellant argues the trial court erred when it failed to instruct sua sponte the jury was to first determine whether Tricia was an accomplice to the charged crime. If it so found, it was to treat her testimony with distrust and as an insufficient basis for finding guilt unless corroborated.

Appellant contends such an instruction was required because there was evidence Jace suffered a serious head injury in mid-October 2000. He asserts that injury made Jace more susceptible to another brain injury. If the prior injury was the result of a felonious assault, the person who committed it would be as responsible as appellant for Jace's death. Appellant argues there was evidence Tricia committed an earlier felonious assault on the child. He notes in October 2000 Tricia was on maternity leave caring for Jace. He also notes a psychologist concluded Tricia was predisposed to abusing her children, and, further, in October 2000 Tricia told appellant's mother Jace had fallen from a couch and she was concerned about him because after that report there was evidence Jace's head started to get larger.

### 1. *Instructions*

Appellant argues the trial court was required to instruct in the terms of CALJIC Nos. 3.10, 3.11, 3.12, 3.18 and 3.19. CALJIC No. 3.10 defines an accomplice as a person subject to prosecution for the same offense charged against the defendant. CALJIC No. 3.11 states a defendant cannot be found guilty upon testimony of an accomplice unless it is corroborated by other evidence tending to connect the defendant with commission of the crime. CALJIC No. 3.12 states such corroborating evidence need not alone establish every element of the crime or corroborate every fact to which the accomplice testified. While incriminating testimony given by an accomplice must be viewed with caution, CALJIC No. 3.18 states such testimony·is not to be arbitrarily disregarded. It further must be given the weight the jury believes it deserves in light of all the evidence. CALJIC No. 3.19 states the defendant must prove a witness is an accomplice by a preponderance of the evidence.

### 2. *Law*

■ The CALJIC instructions noted above correctly state the law applicable to accomplice testimony. If sufficient evidence is presented at trial to conclude a witness is an accomplice, the trial court must so instruct, even in the absence of a request. The reason for the rule requiring accomplice

testimony to be viewed with caution and corroborated is because an accomplice has a natural incentive to minimize his or her own guilt and to enlarge that of others charged with the offense. (*People v. Brown* (2003) 31 Cal.4th 518, 555 [3 Cal.Rptr.3d 145, 73 P.3d 1137].)

### 3. *Background*

When Tricia invoked her Fifth Amendment right against self-incrimination and declined to testify at trial, the prosecutor offered into evidence her testimony from the preliminary hearing.

For the most part Tricia's testimony dealt with relatively mundane background matters. She stated, for example, where the couple lived and the ages of her children. Tricia related Jace's medical history and his visits to the hospital or to see doctors. She reviewed medical problems she had during her pregnancies. Tricia noted on January 2 she returned to work after her maternity leave. She related her activities on January 2 and 3 and gave a general review of her interactions with Jace. She discussed coming home on January 2, discovering the discoloration of Jace's scrotum and taking him to the hospital. She discussed the bathing procedure for the child and the fact Jace had his own towel. She testified on January 3 Jace's towel was in the dryer. She stated that other than the discoloration and swelling of Jace scrotum, he appeared normal on January 2 and when she left home on the morning of January 3. She stated she never had concerns about appellant caring for the children.

In argument the defense offered the theory Jace died from the rebleeding of a prior brain injury. Appellant also argued Tricia, not he, caused the prior injury and its rebleeding was the result of a relatively trivial and noncriminal event.

The jury was instructed concerning the defense of third party culpability, unjoined perpetrators and the concurrent cause rule. With regard to the credibility of witnesses, the jury was told it could consider anything having a tendency to prove or disprove truthfulness, including "[t]he existence or nonexistence of a bias, interest, or other motive."

### 4. *Analysis*

It is not surprising neither the prosecutor, defense counsel nor the trial judge considered accomplice instructions pertinent to this case. Appellant was certainly entitled to attempt to raise a doubt about his own guilt by noting that both he and Tricia had access to Jace and therefore Tricia could have inflicted what his experts considered the mortal brain injury, i.e., the one

occurring months before the child's death. This does not mean, however, there was sufficient evidence to require the trial court to sua sponte instruct on accomplice testimony.

■ Except for the generalized conclusion of a psychologist that Tricia had some predisposition to abuse her children, there was no evidence she ever harmed anyone. The report by appellant's mother that Tricia told her Jace fell from a couch is meaningless. It evidenced no criminal conduct and related nothing about the severity of the injury or whether it was related in any way to Jace's preexisting brain injury. There was simply no substantial basis for finding Tricia was an accomplice for the purpose of requiring an instruction her testimony should be viewed with distrust.

Even if we were to conclude the trial court erred in failing to give accomplice instructions, the error was harmless. Tricia's testimony supplied no crucial element of the prosecution's case. Tricia supplied some background information about Jace and the household and indicated that on January 2 and 3 Jace, except for his discolored scrotum, seemed healthy. While Jace's normal behavior on those days was an important factor, at least to the prosecution's experts, it was not in dispute. Tricia, the medical personnel at the hospital, and appellant himself all agreed Jace appeared normal. There simply was nothing in Tricia's testimony about which the jury needed to be distrustful. There was nothing in need of corroboration.

Even if Tricia was an accomplice within the meaning of CALJIC No. 3.10 and even if she gave testimony requiring corroboration and which deserved to be viewed with caution, appellant was still not harmed by the omission of standard accomplice instructions. Certainly, jurors as a matter of common sense would understand one who might have some criminal responsibility for a death might tailor their testimony to their own advantage. (See generally *People v. Wardrip* (1903) 141 Cal. 229, 232 [74 P. 744].) In any case, the jury was fully instructed concerning third party culpability, counsel argued the matter at length and the jurors were told, if any telling was necessary, in judging credibility they could consider the existence of a witness's motives, bias and interests.

## B. *Eligibility for Probation*

Appellant argues this case should be remanded for a new sentencing hearing. He contends the trial court misinterpreted section 1203, subdivision (e)(3), and erroneously concluded he was presumptively ineligible for probation because he inflicted great bodily injury on his victim.

Except in unusual cases where justice would best be served, appellant notes section 1203, subdivision (e)(3), precludes the granting of probation to

those "who willfully inflicted great bodily injury or torture in the perpetration of the crime" resulting in conviction. He further notes the crime he committed does not require a finding of the infliction of great bodily injury or the intention to inflict such injury. It merely requires an assault "by means of force that to a reasonable person would be likely to produce great bodily injury, resulting in the child's death." (§ 273ab.) He observes the jury was not asked to make any finding concerning the infliction of great bodily injury.

Appellant asserts because the word "willfully" is used in section 1203, subdivision (e)(3), the section's restriction on the granting of probation applies only to those defendants who intend to inflict great bodily injury, not merely to those whose criminal acts resulted in great bodily injury. Noting there was no finding by the jury he intended to inflict great body injury, appellant contends section 1203, subdivision (e)(3), was not an impediment to granting him probation. He contends had the trial court understood appellant was not presumptively ineligible for probation, it is reasonably probable probation would have been granted. Appellant asks we remand the matter for the trial court to reconsider the issue of probation.

### 1. *Background*

In its sentencing memorandum, the prosecution, citing section 1203, subdivision (e)(3), argued appellant was presumptively ineligible for probation. The prosecution stated: "The defendant willfully inflicted great bodily injury upon his son. The injuries were so severe the child died. Therefore, the defendant is presumptively ineligible for probation and should be sentenced to prison." In his report, the probation officer stated pursuant to section 1203, subdivision (e)(3), appellant was presumptively ineligible for probation. At the sentencing hearing, defense counsel agreed appellant was presumptively ineligible for probation pursuant to section 1203, subdivision (e)(3).

It is clear the trial court also believed appellant was presumptively ineligible for probation pursuant to section 1203, subdivision (e)(3). In evaluating the case, the trial court noted appellant had not been convicted of murder and there was no finding appellant intended to kill Jace. It concluded appellant was not a bad man and he had strong support from his friends and family. The court believed appellant would do well on probation and would not be a danger to the community. The court also believed the jury properly found appellant guilty. The court believed appellant had "snapped" under the stress and abused his child. The court stated, however, the circumstances were not such it could find the case an unusual one for the purposes of section 1203, subdivision (e)(3). The court denied probation and sentenced appellant to 25 years to life in prison.

The trial court was not asked for and provided no interpretation of section 1203, subdivision (e)(3).

## 2. *Application of Section 1203, subdivision (e)(3)*

Appellant's claim the trial court misapplied section 1203, subdivision (e)(3), requires us to address three questions: What state of mind must a defendant have during the commission of a crime before the section renders him or her presumptively ineligible for probation? Who must decide whether the defendant harbored that requisite state of mind? In this case did the trial court properly apply the section?

### a. *Intent*

■ A defendant is presumptively ineligible for probation under section 1203, subdivision (e)(3), if he or she "willfully inflicted great bodily injury or torture in the perpetration of the crime."

Section 7, subdivision 1 states: "The word 'willfully,' when applied to the intent with which an act is done or omitted, implies simply a purpose or willingness to commit the act, or make the omission referred to. It does not require any intent to violate law, or to injure another, or to acquire any advantage."

■ Courts have concluded the word "willfully" implies no evil intent but means the person knows what he or she is doing, intends to do it and is a free agent. Usually the word "willfully" defines a general intent crime unless the statutory language requires an intent to do some further act or achieve some future consequence. (*People v. Atkins* (2001) 25 Cal.4th 76, 85 [104 Cal.Rptr.2d 738, 18 P.3d 660].) In the final analysis, however, the meaning of the word "willfully" in any given statute is dependent on the context in which it is used. (*People v. Garcia* (2001) 25 Cal.4th 744, 753 [107 Cal.Rptr.2d 355, 23 P.3d 590].)

■ The word "willfully" as generally used in the law is a synonym for "intentionally," i.e., the defendant intended to do the act proscribed by the penal statute. Section 1203, subdivision (e)(3), so read requires the defendant *intentionally* inflicted great bodily injury or torture in the commission of the crime. The section describes no initial act, e.g., willfully strikes, or willfully burns, resulting in some required particular result, e.g., great bodily injury, the burning of some particular type of property. When the structure of a section requires a willful act followed by some particular result, then it is reasonable to read the willful, i.e., intentional, element as referring only to the initial act and not to the ultimate result. In such sections the word "willfully"

does not require the defendant intend the ultimate result, only that he or she intended the initial act. (See *People v. Atkins, supra,* 25 Cal.4th at pp. 85–89.)

The word "willfully" in section 1203, subdivision (e)(3), does not follow this act/result form. It refers merely to a result, i.e., the infliction of great bodily injury. Given this structure of the section, we conclude the only reasonable reading of it is the word "willful" requires the defendant's intent to cause great bodily injury or torture, not merely that the crime resulted in great bodily injury or torture. (See generally *People v. Gonzales* (1994) 29 Cal.App.4th 1684, 1695–1698 [35 Cal.Rptr.2d 450].)

This interpretation of section 1203, subdivision (e)(3), is supported by a comparison of its language with that of the enhancement for the infliction of great bodily injury contained in section 12022.7, subdivision (a). Section 12022.7 requires a person "personally inflict great bodily injury" on another in the commission or attempted commission of a felony. Unlike section 1203, subdivision (e)(3), it does not require that the infliction be willful. The section has been interpreted to require only a general criminal intent, i.e., the defendant need not intend great bodily injury result, the only intent required is that for the underlying felony.[2] (See *People v. Verlinde* (2002) 100 Cal.App.4th 1146, 1165–1168 [123 Cal.Rptr.2d 322]; *People v. Carter* (1998) 60 Cal.App.4th 752, 755–756 [70 Cal.Rptr.2d 569].)

▇ The inclusion of the word "willfully" in section 1203, subdivision (e)(3), suggests that the Legislature meant the section to be applicable not merely when great bodily injury is the result of a crime but, rather, when the defendant intended to cause great bodily injury.[3]

b. *Trier of Fact*

The core of appellant's claim the trial court erred in concluding he was presumptively ineligible for probation is the jury made no finding he intentionally inflicted great bodily injury. As appellant notes, section 273ab requires only an assault "by means of force that *to a reasonable person would be likely to produce great bodily injury, resulting in the child's death.*"

---

[2] Prior to January 1, 1996, section 12022.7 read in pertinent part: "Any person who, with the intent to inflict the injury, personally inflicts great bodily injury" is subject to an enhancement. (Stats. 1994, ch. 873, § 3, p. 4427.) In 1995, the Legislature amended the statute by deleting the "with the intent to inflict the injury" language. (Stats. 1995, ch. 341, § 1, p. 1851.)

[3] Until 1949 section 1203 denied probation to defendants who, in the perpetration of the crime for which they were convicted "inflicted great bodily injury or torture." (Stats. 1947, ch. 1178, § 2, pp. 2660–2661.) In that year the Legislature modified the section to require the infliction of great bodily injury be willful. (Stats. 1949, ch. 1329, § 1, p. 2324.) In 1957 the Legislature amended section 1203 to allow probation to such defendants in unusual cases. (Stats. 1957, ch. 2054, § 1, p. 3648.)

(Italics added.) Thus, appellant argues the jury was not required to find he actually intended to inflict great bodily injury. Since the jury made no such finding, it was improper for the trial court to find him presumptively ineligible for probation under section 1203, subdivision (e)(3).

■ Unlike sections making a defendant ineligible for probation, e.g., section 1203.075, subdivisions (a), (b)(1), section 1203, subdivision (e)(3), contains no requirement the circumstances causing a restriction on probation be pleaded or decided by the trier of fact. When the issue is whether a defendant is presumptively ineligible for probation under section 1203, the trial court may make the factual determination necessary for application of the restriction. (See *People v. Dorsch* (1992) 3 Cal.App.4th 1346, 1349–1351 [5 Cal.Rptr.2d 327]; see also *In re Varnell* (2003) 30 Cal.4th 1132, 1140–1144 [135 Cal.Rptr.2d 619, 70 P.3d 1037].)

Thus, the jury was not required to make a finding on the question whether appellant intentionally inflicted great bodily injury within the meaning of section 1203, subdivision (e)(3).

### c. *Determination*

It seems to have been assumed by both parties, the probation officer and the trial court that appellant was presumptively ineligible for probation. The trial court was not asked to find and did not state on the record appellant intended to inflict great bodily injury on Jace. Only if the trial court finds that appellant intended to inflict great bodily injury on Jace would appellant be presumptively ineligible for probation under section 1203, subdivision (e)(3). Given the serious nature of the offense, the lack of clarity in the law on this issue before this opinion and the importance of a clear record, we remand the matter to the trial court for a new probation and sentencing hearing at which the court should determine whether appellant is presumptively ineligible for probation.[4]

### C. *Cruel and Unusual Punishment*[5]

We express no opinion on the manner in which the court deals with the issues of probation and sentencing on remand. In the event, however, the

---

[4] Because we are remanding this case for resentencing, we need not consider appellant's argument counsel provided ineffective assistance when he failed to resist the assertion of the probation officer and prosecutor he was presumptively ineligible for probation pursuant to section 1203, subdivision (e)(3).

[5] The federal Constitution refers to "cruel and unusual punishment" (U.S. Const., 8th Amend.) while the California Constitution refers to "[c]ruel or unusual punishment" (Cal. Const., art. I, § 17). This difference does not affect the analysis of claims of cruel and/or unusual punishment. (*People v. Mantanez* (2002) 98 Cal.App.4th 354, 358, fn. 7 [119 Cal.Rptr.2d 756].)

same sentence is imposed, in the interest of judicial economy we respond to Lewis's contention the sentence is cruel and unusual punishment. Appellant argues under both the federal and state Constitutions, imposition of his sentence (i.e., a term of 25 years to life in prison for assaulting a child in his care under eight years of age by means of force that to a reasonable person would be likely to produce great bodily injury and death) results in cruel and unusual punishment. More specifically, he argues such punishment is cruel and unusual because (1) while imposing the same punishment as that for first degree murder, it requires only the mental element for a misdemeanor assault, and (2) he has no prior criminal record and is not a danger to society.

■ The Eighth Amendment of the United States Constitution prohibits the imposition of cruel or unusual punishment. "[A]n Eighth Amendment analysis requires a finding of 'gross disproportionality' between the offense and the offender and the punishment." (*People v. Norman* (2003) 109 Cal.App.4th 221, 230 [134 Cal.Rptr.2d 652].) In *Norman* the court noted the United States Supreme Court has upheld life sentences for nonviolent offenses, e.g., life without parole for those who possess large quantities of drugs, and life terms for nonviolent recidivists. *Norman* concluded, therefore: "Since a sentence of life without parole is not cruel and unusual punishment for certain nonviolent offenses, then, a fortiori, a sentence of 25 years to life is not cruel and unusual for the death of a child under age eight." (*Ibid.*)

■ Under article I, section 17 of the California Constitution a punishment is cruel or unusual if in the abstract or as applied to the particular defendant " 'it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.' " (*People v. Dillon* (1983) 34 Cal.3d 441, 478 [194 Cal.Rptr. 390, 668 P.2d 697].)

■ In determining whether in the abstract the punishment for an offense is disproportionate to the crime, we focus on three issues: (1) the nature of the offense, (2) a comparison with the punishment imposed for more serious crimes in California and (3) a comparison with the punishment imposed for the same or similar offenses in other jurisdictions. (*In re Lynch* (1972) 8 Cal.3d 410, 425–427 [105 Cal.Rptr. 217, 503 P.2d 921]; *People v. Norman, supra,* 109 Cal.App.4th at p. 230.)

■ Section 273ab describes a very serious offense. Not only does the crime require the killing of an extremely vulnerable child, it requires an assaultive act of great violence by one charged with the child's care.

Central to appellant's claim his punishment is cruel or unusual is that it is the same as the punishment for first degree murder when, he contends, his

offense was less serious and more like assault by means of force likely to cause great bodily injury (§ 245, subd. (a)) or involuntary manslaughter (§ 192, subd. (b)). While it is true section 273ab does not require an intent to kill or any other form of malice aforethought, neither does first degree felony murder (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1140–1141 [124 Cal.Rptr.2d 373, 52 P.3d 572]) and neither does the three strikes law. (See *People v. Norman, supra,* 109 Cal.App.4th at p. 231.)

The Legislature could reasonably conclude given the particular vulnerability of the victim, the relationship of the victim to the defendant, the violent and purposeful nature of the act involved and the fact a death results, the crime described in section 273ab is a very serious one and a term of 25 years to life was appropriate.

In *Norman* the court noted while 14 other states have special child abuse statutes for child homicide, none is analogous to section 273ab. No comparison, therefore, of punishments between jurisdictions is possible. (*People v. Norman, supra,* 109 Cal.App.4th at pp. 231–232.)

We conclude the imposition of a prison term of 25 years to life for the offense described in section 273ab is not in the abstract cruel and unusual.

This does not end the inquiry. While a punishment may not be cruel and unusual in the abstract, it may be unconstitutional as applied to a particular defendant. The task is to decide if the penalty imposed is grossly disproportionate to the defendant's culpability. Stated another way, does "the punishment shock[] the conscience and offend[] fundamental notions of human dignity." (*People v. Cox* (2003) 30 Cal.4th 916, 970 [135 Cal.Rptr.2d 272, 70 P.3d 277].) In making this inquiry courts consider the circumstances of the offense, including the defendant's motive, the extent of the defendant's involvement in the crime, the manner in which the crime was committed, the consequences of the act, the defendant's age and history of criminality and the defendant's mental capabilities. (*Ibid.*)

Appellant is a relatively young man without a criminal record. Still, the amount of force required to cause four-month-old Jace's fatal head injuries and the amount of anger and loss of control that led to the assault all lead us to conclude while the punishment imposed is harsh, it is not disproportionate to appellant's culpability.

The trial court's denial of probation is reversed. The matter is remanded for resentencing. In all other respects the judgment is affirmed.

McDonald, J., and McIntyre, J., concurred.

A petition for a rehearing was denied August 18, 2004, and respondent's petition for review by the Supreme Court was denied October 13, 2004.