Filed 7/15/14  P. v. Quiroz CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ROBERT TORIBIO QUIROZ,<br><br>Defendant and Appellant. | F064384<br><br>(Super. Ct. No. F06908986)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Jonathan B. Conklin, Judge.

Jerome P. Wallingford, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and John A. Bachman, Deputy Attorney Generals, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

On November 18, 2006, appellant Robert Toribio Quiroz killed his three-month-old son by fracturing his skull. Appellant also broke 10 of the baby's ribs. Appellant was convicted after jury trial of second degree murder (count 3; Pen. Code,[1] § 187, subd. (a)), child homicide (count 4; § 273ab) and willful infliction of corporal injury to a child (count 2; § 273d, subd. (a)).[2] An enhancement allegation attached to count 2 for personal infliction of great bodily injury on a child under the age of five was found to be true. (§ 12022.7, subd. (d).) Appellant was sentenced to 25-years-to-life imprisonment.

Appellant argues that the trial court prejudicially erred by (1) admitting autopsy photographs (People's exhibits Nos. 3-8), (2) failing to give a unanimity instruction, and (3) failing to instruct on assault with force likely to cause great bodily injury as a lesser included offense of child homicide. Appellant challenges his sentence as cruel and/or unusual punishment and argues that the concurrent term that was imposed on count 2 must be stayed pursuant to section 654. None of these arguments is persuasive. The judgment will be affirmed.

# FACTS

Roman Quiroz was born on August 21, 2006. Roman's mother, Candice Quiroz, suffered a fatal aneurism shortly after his birth. Appellant was serving in the Marine Corps and had been deployed to Iraq a few days before Roman's birth. Appellant returned to Fresno to care for Roman and his 13-month-old sibling. The trio moved in

---

[1] Unless otherwise specified, all statutory references are to the Penal Code.

[2] Appellant was arrested on November 20, 2006, and the complaint was filed two days later. Appellant was granted several trial continuances. Trial commenced on October 14, 2011.

with Kami Short, who is one of Candice's sisters. Candice's sisters and her mother helped appellant care for his children.[3]

Roman's left arm was fractured when he was approximately six weeks old. Appellant could not explain how the injury occurred.[4] Child Protective Services (CPS) took custody of Roman for a few days but returned him to appellant's custody due, in part, to its inability to determine who injured the baby. CPS offered appellant voluntary family maintenance services, which appellant accepted.

Around 9:30 p.m. on November 18, 2006, appellant dialed 911 and reported that Roman, who was approximately three months old, was unconscious and not breathing. The emergency dispatcher directed appellant to place Roman on the floor and initiate CPR. Appellant told the dispatcher that Roman spit up while he was performing CPR. The dispatcher told appellant to clear Roman's airway and continue CPR.

Appellant told emergency responders that Roman stopped breathing 10 minutes before he called 911 and he did not know of any trauma or reason why this occurred. Mike Mollica, who has been a captain in the Fresno City Fire Department for 20 years, was one of the emergency responders. He estimated that Roman stopped breathing about 20 to 30 minutes before he arrived. Captain Mollica did not see any signs of vomit on Roman or on the floor. Appellant did not mention to Captain Mollica "that the baby's head struck something or any type of trauma to the baby."

Roman was transported to the hospital where he was pronounced dead later that night. Police officers interviewed appellant at the hospital. Appellant said that when he noticed Roman was limp and nonresponsive there was vomit on the couch.

---

[3] Solely to enhance clarity, some individuals are referenced by their first names. No disrespect is intended or implied by this informality.

[4] Appellant was charged in count 1 with willfully inflicting corporal punishment on Roman and thereby fracturing the baby's left arm. (§ 273d, subd. (a).) The jury returned a not guilty verdict on this count.

Fresno Police Detective Brad Alcorn interviewed appellant at Kami's house later that night. Appellant said that he was at Kami's house with his children. Roman was fussy and crying. He took Roman out of the car seat and placed him on the couch. He propped a bottle on a blanket so Roman could continue feeding and put his older child to bed in another room. He returned about 20 minutes later. Roman was not breathing. Appellant thought Roman had choked or suffocated on formula.

An autopsy revealed that Roman suffered a complex skull fracture and there were two areas of hemorrhage on the back of his skull. The skull fracture was "a branching type of fracture which has different limbs on it and this fracture had at least four branches on it." This "tends to indicate the impact was more on the right side back of the head." Dr. Michael Chambliss, who performed the autopsy, testified that these injuries were caused by blunt force trauma and were far enough apart to support an inference that there were two separate locations of impact. The skull fracture was a "higher velocity type of injury" that required "a considerable amount of force." It is similar to injuries sustained in automobile accidents. He opined that Roman's head struck a flat surface with a large area of mass. It is not consistent with Roman having hit a padded surface because the padding would absorb some of the impact to the child's head.

The autopsy also revealed that the third through ninth ribs on the left side of Roman's chest and the fourth through sixth ribs on the right side of his chest were fractured. There were dime size bruises on the front of Roman's chest several inches below each nipple. The rib fractures were consistent with someone holding Roman by the rib cage and applying considerable force. The rib fractures are of a "nonaccidental-type" and were not likely to have been caused by resuscitation efforts. Dr. Chambliss could not precisely determine when Roman's ribs were broken or if they were all broken at the same time. Some of the cellular evidence indicated some of the rib injuries occurred at least 72 hours before Roman's death while other cellular evidence indicated other rib injuries occurred around the same time as the skull fracture. Dr. Chambliss

4.

testified that the possibility of "an additional injury on top of an older one" could not be ruled out.

Dr. Chambliss determined that the head injuries were the immediate cause of death and that Roman was the victim of "Fatal Child Abuse Syndrome" with "physical injuries in multiple locations, the ribs, left forearm, along with the more acute head injury.... All of these injuries are a result of blunt trauma."

Dr. Chambliss ruled out the possibility Roman choked on formula. There was liquid in Roman's stomach which is consistent with him having eaten prior to the skull fracture. Roman would not have been able to drink out of a bottle after sustaining the head injury.

Appellant was interviewed by Detective Alcorn after the autopsy. Appellant said that he accidentally hit Roman's head against the floor when he placed him on the ground to perform CPR. After the autopsy results were disclosed to appellant he said, for the first time, while he was placing Roman on the couch to feed him he accidentally hit Roman's head on one of the armrests. Appellant did not explain how Roman's ribs were fractured.

Appellant testified on his own behalf. On November 18, 2006, he spent the day moving from Kami's house into an apartment. That evening he took the children back to Kami's house because he did not have any diapers. Kami and her family were camping and the house was empty. Roman began crying. He took Roman out of his car seat and placed him on a couch. Appellant said that he was in a hurry and as he set Roman on the couch, he accidentally struck Roman's head on one of the armrests. Roman made a noise and looked dazed. Appellant began to feed Roman. He propped the bottle against the couch and went into another room to put his other child to bed. Appellant said that Roman was drinking from the bottle when he left the room. He returned about 20 minutes later and discovered Roman unconscious and nonresponsive. Appellant immediately gave Roman CPR. Then he placed Roman on the couch, unsuccessfully tried to call a relative and then called 911. The emergency dispatcher told appellant to

5.

perform CPR. He accidentally struck Roman's head on the hardwood floor when he placed the baby on the ground to begin CPR. He used his palms to perform chest compressions because he had difficulty doing so with his fingers. Roman spit up. When appellant heard the emergency responders arrive he placed Roman on the couch, got his keys from another room, and ran outside to unlock the gate. Then he waited on the porch for the responders. He watched as they placed Roman on the floor and performed CPR.

Appellant testified that he did not mention to the emergency responders or the police officers that Roman's head hit one of the couch's arm rests because he was ashamed of it and did not think that it was important. At that time, appellant thought that Roman had choked on his bottle. After the police officer told him about the autopsy results, he "acknowledge[d] that [he was] responsible for the skull" fracture by accidentally striking Roman's head on one of the couch's armrests. Appellant did not have any explanation how or when Roman's ribs were broken. Appellant testified that when Detective Alcorn told him that some of Roman's ribs had been broken, he wondered aloud whether this could have been caused by CPR. The police officer told him that the fractures could not have been caused that way. Appellant testified that he did not "do anything else" that he could have fractured Roman's ribs.

Appellant's best friend and his high school drama teacher testified that he was honest and had a "non-aggressive personality."

## DISCUSSION

### I. Admission Of Autopsy Photos Was Not An Abuse Of Discretion and Did Not Infringe Appellant's Due Process Rights.

#### A. Facts.

Photographs were taken during the autopsy. People's exhibit No. 1 depicts an X-ray of Roman's left arm. People's exhibit No. 2 depicts Roman's upper chest before the autopsy was performed. People's exhibits Nos. 3, 4, 5 and 6 depict the exterior of Roman's skull after the skin was pulled back and it was partially cleaned, revealing the

fracture from different angles. People's exhibit No. 7 depicts the bruising and hematomas that were revealed after the skin was initially pulled. People's exhibit No. 8 depicts the interior of the empty cranium.[5]

The People motioned to admit the autopsy photographs. The prosecutor argued during the in limine hearing that the autopsy photographs were relevant to prove the cause and manner of Roman's death as well as the degree of force required to cause the cranial injuries. The autopsy photographs would assist Dr. Chambliss during his testimony describing the location and nature of the cranial injuries.

Defense counsel objected to admission of the autopsy photographs of Roman's skull on the basis of Evidence Code section 352.[6] He argued that the photographs were gory and irrelevant because the defense was "not going to be contesting the injuries per se." He asserted that Dr. Chambliss did not need photographs to explain the nature of the cranial injuries and, if the court determined otherwise, one to three photographs would be adequate.

The court stated that it had reviewed decisions by the California Supreme Court discussing "the Court's process to weigh the admission or exclusion of such photographs, obviously, pursuant to [Evidence Code] section 352." The court excluded People's exhibit No. 3 on the ground that it was duplicative and admitted the rest of the autopsy photographs. It found that People's exhibits Nos. 7 and 8 will "assist [the doctor] in his presentation" and People's exhibits Nos. 4, 5 and 6 are relevant because "we are looking at a skull of an infant in various stages of autopsy." The court accepted defense counsel's request that the parties be allowed to offer "further input should it become necessary" during trial.

---

[5]     The autopsy photographs have been made a part of the appellate record.

[6]     Appellant did not oppose admission of autopsy photographs depicting Roman's upper chest and an X-ray of his left arm (People's exhibits Nos. 1 & 2).

During Dr. Chambliss's testimony each photograph was briefly displayed outside the jury's presence to provide counsel an opportunity to ask appropriate questions. Defense counsel did not object to admission of the autopsy photographs. He stated, in relevant part, "I'm not going to object to anything we've already agreed upon."

Dr. Chambliss used the photographs during his testimony to show the location and nature of the head injuries.

**B.      Admission of the autopsy photographs was not an abuse of discretion.**

Appellant argues that admission of the autopsy photographs of Roman's skull was an abuse of discretion because any probative value was substantially outweighed by the risk of undue prejudice. We are not convinced.[7]

> "The rules pertaining to the admissibility of photographic evidence are well settled. Only relevant evidence is admissible [citations], and all relevant evidence is admissible, unless excluded under the federal or California Constitution or by statute. [Citations.] Relevant evidence is defined in Evidence Code section 210 as evidence 'having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' The test of relevance is whether the evidence tends '"logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive. [Citations.]' [Citation.] The trial court has broad discretion in determining the relevance of evidence [citations], but lacks discretion to admit irrelevant evidence. [Citations.]" (*People v. Scheid* (1997) 16 Cal.4th 1, 13-14.)

""'The admission of photographs of a victim lies within the broad discretion of the trial court when a claim is made that they are unduly gruesome or inflammatory. [Citations.] The court's exercise of that discretion will not be disturbed on appeal unless the probative value of the photographs clearly is outweighed by their prejudicial effect.

---

[7]      Defense counsel preserved the issue for appellate review by objecting during the in limine hearing to admission of this evidence on the basis of Evidence Code section 352. Defense counsel did not forfeit the point or invite error by failing to reiterate this objection during trial.

[Citations.]"' [Citation.]" (*People v. Montes* (2014) 58 Cal.4th 809, 862 [autopsy photos properly admitted].)

> "The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, "prejudicial" is not synonymous with "damaging."' [Citation.]" (*People v. Karis* (1988) 46 Cal.3d 612, 638.)

"Autopsy photographs are routinely admitted to establish the nature and placement of the victim's wounds and to clarify the testimony of prosecution witnesses regarding the crime scene and the autopsy, even if other evidence may serve the same purposes." (*People v. Howard* (2010) 51 Cal.4th 15, 33.) Such photographs are relevant to corroborate testimony about the cause of death and location of injuries. (*People v. Allen* (1986) 42 Cal.3d 1222, 1256.) Autopsy photographs are probative to illustrate a forensic expert's testimony. (*People v. Virgil* (2011) 51 Cal.4th 1210, 1248.)

In this case, that the photographs of Roman's skull were probative "to assist the jurors in understanding the medical testimony about the autopsy." (*People v. Garcia* (2008) 168 Cal.App.4th 261, 294.) They aided the jury in understanding Dr. Chambliss' testimony about the cause of death, the nature and placement of Roman's wounds and the force required to cause such injuries. Since Roman's cranial injuries were subdermal, the jury did not have available to it other evidence visually depicting the location of his cranial injuries and complexity of the fracture. Even if the photographs were, to some extent, cumulative to Dr. Chambliss' testimony about the autopsy results, this does not extinguish their probative value. Autopsy photographs are "not made inadmissible by the prosecutor's ability to prove motive, intent, and cause of death through other evidence." (*People v. Montes, supra*, 58 Cal.4th at p. 862.) Prosecutors are not required "'to prove

9.

their case with evidence solely from live witnesses; the jury is entitled to see details of the victims' bodies to determine if the evidence supports the prosecution's theory of the case.'" (*People v. Roldan* (2005) 35 Cal.4th 646, 713, overruled on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22 .)

We are not persuaded by appellant's contention that the photographs did not have significant probative value because he did not challenge the nature of Roman's injuries. Appellant testified that he caused the hematomas and skull fracture by accidentally hitting Roman's head on one of the couch's arm rests and the floor. The photographs were relevant to, and assisted the jury in assessing the credibility of that testimony.

The probative value of the autopsy photographs was not substantially outweighed by the risk of undue prejudice. In reaching this conclusion we are guided by recent decisions by the California Supreme Court. In *People v. Montes*, *supra*, 58 Cal.4th 809, the Court upheld admission of 13 autopsy photographs. It reasoned: "While the admitted photographs confirm that 'murder is seldom pretty' [citation], they are not of such a nature as to overcome the jury's rationality. [Citation.]" (*Id.* at p. 862.) In *People v. Jackson* (2014) 58 Cal.4th 724, the Court upheld admission of an autopsy photograph of an embryo. It found the photograph was not "gory nor particularly disturbing" and was relevant to demonstrate the basis for the pathologist's opinion that the murder victim was pregnant. (*Id.* at p. 757.)

Similarly, in this case the contested autopsy photographs were relevant to disputed factual issues. The number of admitted photographs was not excessive. The photographs are "unpleasant, but not unduly shocking, gruesome, or inflammatory. The photographs are clinical in appearance .…" (*People v. Garcia, supra*, 168 Cal.App.4th at p. 294.) While the photographs are distressing, so is all evidence pertaining to the murder of a baby. The autopsy photographs are not comparable to crime scene photographs where the body is displayed in situ.

10.

For all of these reasons, we conclude that the contested autopsy photographs were properly admitted into evidence. The trial court did not abuse its discretion in determining that the photographs' probative value was not substantially outweighed by the risk of undue prejudice.

### C. Appellant's due process rights were not infringed.

Appellant also contends that admission of the contested autopsy photographs infringed his federal constitutional due process rights. We are not persuaded. The admission of relevant evidence does not offend a defendant's federal constitutional due process rights unless the evidence is so prejudicial that it renders the defendant's trial fundamentally unfair. (*People v. Hamilton* (2009) 45 Cal.4th 863, 930; *People v. Partida* (2005) 37 Cal.4th 428, 439.) As previously explained, the contested autopsy photographs were highly probative. They were not inflammatory or likely to evoke an emotional bias against appellant as an individual. Admission of these photographs did not render the trial fundamentally unfair or undermine the reliability of the outcome. Appellant's due process rights were not infringed.

## II. Failure To Give An Unanimity Instruction Was Harmless Beyond A Reasonable Doubt.

Appellant argues that a unanimity instruction was required because he was charged with one count of willfully inflicting corporal injury to a child based on Roman's broken ribs but the evidence could reasonably be interpreted as proving that Roman sustained two separate rib injuries. Assuming without deciding that instruction on this point was warranted, the omission was harmless beyond a reasonable doubt.

A criminal defendant is entitled to a verdict in which all 12 jurors agree as a matter of due process under the state and federal Constitutions. In any case in which the evidence would permit jurors to find the defendant guilty of a crime based on two or more discrete acts, either the prosecutor must elect among the alternatives or the court must require the jury to agree on the same criminal act. (*People v. Russo* (2001) 25

Cal.4th 1124, 1132-1133.) Where it is warranted by the evidence, the court must give an unanimity instruction sua sponte. (*People v. Riel* (2000) 22 Cal.4th 1153, 1199.)

The omission of a unanimity instruction is reversible error if, without it, some jurors may have believed the defendant guilty based on one discrete criminal act, which others may have believed him guilty based on another criminal act. (*People v. Russo, supra*, 25 Cal.4th at p. 1133; *People v. Wolfe* (2003) 114 Cal.App.4th 177, 183-184.) A split has developed in the California appellate courts concerning the applicable prejudice standard. Some courts test the failure to give an unanimity instruction under the stringent federal constitutional standard of harmless beyond a reasonable doubt (*Wolfe, supra,* 114 Cal.App.4th at p. 184), while other courts apply the California state standard of a reasonable probability of a more favorable verdict. (*People v. Vargas* (2001) 91 Cal.App.4th 506, 562.)

In this case, failure to include a unanimity instruction in the jury charge was nonprejudicial even when the omission is assessed under the stringent federal constitutional standard. There was no significant evidentiary basis upon which the jury could have concluded that appellant was guilty of injuring Roman's ribs on one occasion, but not on the other. At no point in time did appellant explain how Roman's ribs were injured.[8] Appellant did not testify that Roman's ribs were injured while someone else was taking care of the baby. There was no evidence indicating that Roman's grandmother, aunts or cousin injured his ribs. Unlike Roman's broken arm, CPS did not investigate the rib fractures and conclude that it could not be determined who caused these injuries. The jury resolved the basic credibility dispute against appellant. Any

---

[8] Appellant did not testify that he fractured Roman's ribs while performing CPR. He testified that after Detective Alcorn told him about the fractured ribs he asked the detective if the rib injuries could have occurred while he was performing CPR. The detective replied that the injuries could not have occurred that way. Appellant then told the detective that he did not know how Roman's ribs were broken.

juror believing that appellant injured Roman's ribs on one occasion would also believe that he did so on both occasions.

Therefore, we conclude that failure to give a unanimity instruction was harmless beyond a reasonable doubt.

### III. The Court Was Not Required To Instruct On Assault With Force Likely To Cause Great Bodily Injury As A Lesser Included Offense Of Child Homicide.

Appellant contends that the trial court was obligated to instruct, sua sponte, on assault by means of force likely to cause great bodily injury (§ 245, subd. (a)(1)) as a lesser included offense to child homicide as charged in count 4 (§ 273ab). This argument is not convincing.

#### A. Facts.

The court and counsel conferred off the record about jury instructions. During proceedings on the next day the court stated on the record that defense counsel had not requested instruction on aggravated assault as a lesser included offense to child homicide. Defense counsel said, "I'm satisfied with the lesser that we have." The court stated that it did "not see any reasonable interpretation of the evidence that could support the intervening verdict, so to speak, of assault with GBI; therefore, I will not be giving it." The court instructed on simple assault (§ 240) as a lesser included offense to child homicide.

#### B. Guiding legal principles.

"A trial court must instruct concerning all lesser included offenses which find substantial support in the evidence. [Citation.] An offense is necessarily included in a greater offense when, for present purposes, under the statutory definition of the offenses the greater offense cannot be committed without necessarily committing the lesser. [Citations.] To warrant such an instruction, there must be substantial evidence of the lesser included offense, that is, 'evidence from which a rational trier of fact could find beyond a reasonable doubt' that the defendant committed the lesser offense. [Citation.] Speculation is insufficient to require the giving of an instruction on a lesser included offense and a lesser included instruction need not be given when there is no evidence that the offense is less than

13.

that charged.  [Citation.]"  (*People v. Basuta* (2001) 94 Cal.App.4th 370, 392.)

"[O]n appeal we employ a de novo standard of review and independently determine whether an instruction on the lesser included offense ... should have been given."  (*People v. Manriquez* (2005) 37 Cal.4th 547, 584.)

**C.     The crimes of child homicide and aggravated assault have analogous mens rea requirements.**

Appellant's instructional claim is premised, in part, on the position that aggravated assault and child homicide have different mental states.  This point has been resolved adverse to appellant's position.  Both offenses are general intent crimes and have "analogous" mens rea requirements.  (*People v. Albritton* (1998) 67 Cal.App.4th 647, 658.)  The mens rea necessary to prove child homicide in violation of section 273ab "is willfully assaulting a child under eight years of age with force that objectively is likely to result in great bodily injury--that is, the assault must be intentional.  Whether the force is objectively likely to result in great bodily injury is a question for the trier of fact."  (*Albritton, supra,* at p. 658.)  "[S]ection 273ab does not require an intent to kill or any other form of malice aforethought .…"  *(People v. Lewis* (2004) 120 Cal.App.4th 837, 856 (*Lewis*).)  The crime of aggravated assault requires proof that the defendant willfully did an act that would directly and probably result in the application of force that was likely to produce great bodily injury.  (CALCRIM No. 875.)  "As far as mens rea is concerned, section 273ab is analogous to section 245, subdivision (a)(1), which makes it a felony for any person 'by any means of force likely to produce great bodily injury' to commit an assault upon another.  Section 245, subdivision (a)(1), does not require a specific intent to produce great bodily injury.  [Citation.]  It is a general intent crime.  [Citation.]"  (*Albritton, supra*, 67 Cal.App.4th at p. 658.)

**D.    The court did not have a sua sponte duty to instruct on aggravated assault.**

It is settled that a trial court does not have a sua sponte obligation to instruct on a lesser included offense "when there is no evidence the offense was less than that charged." (*People v. Moye* (2009) 47 Cal.4th 537, 548.)  Having carefully examined the record we conclude that this is such a case.

The evidence is uncontroverted that Roman's death was caused by the cranial injuries.  The record does not contain evidence from which a jury reasonably could have concluded that these injuries resulted from contact with a couch armrest as described by appellant.  Dr. Chambliss testified that the skull fracture and hematomas could not have been caused by accidental contact with a couch's padded arm rest.  Appellant did not proffer any expert medical testimony or other evidence contradicting Dr. Chambliss' testimony on this key factual point.  Also, because it was undisputed that the cranial injuries were fatal, any finding that appellant willfully assaulted Roman necessarily leads to a finding that appellant was guilty of child homicide.  For both of these reasons, we conclude that the record does not contain evidence from which a reasonable jury could conclude that appellant was guilty of aggravated assault, but not of child homicide. Therefore, the court did not have a sua sponte duty to instruct on this lesser offense.

**IV.    Appellant Was Properly Sentenced.**

**A.    Facts.**

The probation report recommended appellant be sentenced to 25 years to life on count 4 (child homicide) plus a consecutive term of 12 years on count 2 (corporal injury to a child plus great bodily injury enhancement) and the punishment imposed on count 3 (second degree murder) should be stayed pursuant to section 654.

Appellant filed a presentencing memorandum in which he urged the court to sentence him to 15 years to life on count 3 with a concurrent term for count 2 and to stay the punishment imposed for count 4.  He summarily asserted that imposition of 25 years

to life imprisonment would constitute cruel and unusual punishment. He argued that it would be unfair to order the sentence imposed on count 2 to run consecutively because "it is not totally clear whether or not the broken ribs were a totally separate act from the same acts which the jury found to have been committed by the Defendant and resulted in the conviction for *Count 3* … and *Count 4*." As part of this argument, appellant "pointed out that ... if *P.C. 654* does not apply, it is certainly very close to being applicable."

During the sentencing hearing defense counsel focused his remarks on count 2, arguing that the sentence should be ordered to run concurrently. He asserted consecutive sentencing would be unfair. He also said:

> "[A]lthough it may not be a clear cut [section] 654 situation, I believe that because there are elements of [section] 654, and it is somewhat unclear when this occurred as pointed out in my review of Dr. Chambliss' testimony, for that reason and also just for the Court's discretion, ... whichever term the Court selects ... should run concurrent; and that the sentence ultimately then by the Court would be the life sentence, which is more than likely it would be the 25 to life, because I think that is adequate punishment."

The prosecutor did not argue in favor of, or against, concurrent sentencing on count 2. He did not comment on section 654's potential applicability to count 2.

The court selected count 4 as the base term and imposed the statutorily mandated term of 25 years to life. It stayed the indeterminate term of 15 years to life that was imposed for count 3. The court imposed an aggregate 12 year term on count 2 and ordered this sentence to run concurrently. The court stated:

> "… And I agree with [defense counsel's] comments concerning Count 2. I do find that the appropriate sentence on Count 2 is the aggravated term of six years, enhanced by the aggravated six years [for the great bodily injury enhancement] for 12 years, but I see no reason to run that consecutively. I do believe that 25 years to life is the appropriate sentence in this case."

16.

**B.      Appellant's sentence is not cruel and/or unusual punishment.**

Appellant was sentenced to 25 years to life imprisonment for child homicide (count 4). In an act of lenity, the trial court ordered the 12 year determinate term imposed for corporal injury on a child (count 2) to run concurrently with the indeterminate term. The court reasoned that 25 years to life is the "appropriate punishment for the actions that [appellant] took." Consequently, appellant, who could have been legally sentenced to an aggregate term of 37 years to life, faces only 25 years to life. Appellant complains that his sentence is cruel and/or unusual punishment. This argument is meritless.

In *People v. Norman* (2003) 109 Cal.App.4th 221 (*Norman*), the defendant killed his six-year-old son and was convicted of second degree murder and child homicide. He was sentenced to 25 years to life. On appeal, he unsuccessfully argued that his sentence constitutes cruel and/or unusual punishment. The appellate court reasoned that "[a] life sentence for a vicious murder of a small child cannot be said to be disproportionate whether it was premeditated or not. Despite defendant's repeated requests to view section 273ab in the abstract, he ignores the fact that this terrible child homicide was a second degree murder. He cannot argue he did not possess malice because the jury found he did so." (*Id*. at p. 230.) Further, "there is nothing to indicate to us that the California statute is grossly out of step with similar statutes in the rest of the country, particularly when a defendant has also been convicted of murder." (*Id*. at p. 232, fn. omitted.)

In *Lewis, supra,* 120 Cal.App.4th 837, the defendant fatally shook his four-month-old son and fractured several of the baby's ribs. He was convicted of child homicide and sentenced to 25 years to life imprisonment. The appellate court held that his sentence was not cruel and/or unusual punishment on its face or as applied. It reasoned that even though section 273ab does not require an intent to kill or malice, the Legislature could reasonably conclude that this sentence was appropriate "given the particular vulnerability of the victim, the relationship of the victim to the defendant, the violent and purposeful

17.

nature of the act involved and the fact a death results." (*Id.* at p. 856.) Further, "[a]ppellant is a relatively young man without a criminal record. Still, the amount of force required to cause four-month-old Jace's fatal head injuries and the amount of anger and loss of control that led to the assault all lead us to conclude while the punishment imposed is harsh, it is not disproportionate to appellant's culpability." (*Ibid.*)

*Norman* and *Lewis* are sound, well-reasoned decisions. There is no convincing basis to reject their conclusions that a sentence of 25-year-to-life imprisonment for child homicide is not unconstitutionally cruel and/or unusual punishment on its face. (*Norman, supra*, 109 Cal.App.4th at pp. 231-232; *Lewis, supra*, 120 Cal.App.4th at pp. 855-856.)

This does not end the inquiry. The next task is to decide if the penalty is unconstitutional as applied to appellant because it is grossly disproportionate to his culpability. "In making this inquiry courts consider the circumstances of the offense, including the defendant's motive, the extent of the defendant's involvement in the crime, the manner in which the crime was committed, the consequences of the act, the defendant's age and history of criminality and the defendant's mental capabilities. [Citation.]" (*Lewis, supra*, 120 Cal.App.4th at p. 856.)

We reject appellant's self-serving portrayal of himself. Appellant ignores the key fact that the jury found him guilty of second degree murder in addition to child homicide, meaning that it concluded beyond a reasonable doubt that he acted with malice aforethought. Also, it is entirely reasonable to conclude from the trial evidence that Roman cried frequently because he was in pain due to injuries inflicted by his father. If appellant felt frustrated, angry or overwhelmed by his circumstances he could have obtained assistance through CPS family maintenance services or the grief counselor that was offered by the Marine Corp. Also, the 25 year sentence is not functionally equivalent to life without parole. Appellant was 20 years old when he murdered Roman and will be eligible for parole around his 40th birthday. Unless appellant commits more crimes while imprisoned, he could be paroled while still a relatively young man. Here, as

in *Lewis*, "the amount of force required to cause four-month-old [Roman's] fatal head injuries and the amount of anger and loss of control that led to the assault all lead us to conclude [that] the punishment ... is not disproportionate to appellant's culpability." (*Lewis, supra*, 120 Cal.App.4th at p. 856.)

### C.     Section 654 does not require the term imposed for count 2 to be stayed.

Appellant contends that during the sentencing hearing defense counsel argued that section 654 applied to count 2 and "misspoke when he said the sentence should be made concurrent pursuant to section 654.  When section 654 applies, it requires that sentence be stayed, not made to run concurrent."  Appellant further contends that the trial court "agreed that section 654 precludes a consecutive sentence in this case.  Given this finding, the court committed error by running the term for count two concurrently."

Appellant's interpretation of the record is erroneous.  Defense counsel did not argue that section 654 applied to count 2 and the trial court did not make such a finding. Defense counsel referenced section 654 as part of his argument that the court should order the sentence imposed for count 2 to run concurrently with the term imposed for count 3 or 4.  The court agreed that concurrent sentencing was appropriate.

In a fallback position, appellant argues that if we read the record of the sentencing hearing as we have done, the trial court erred by failing to apply section 654 to count 2. He asserts that "this court cannot reasonably find that the rib injuries and the homicide constituted separate acts with different objectives."  This contention is devoid of merit.

When offenses are committed on different occasions, they may be punished separately.  (*People v. Kwok* (1998) 63 Cal.App.4th 1236, 1253.)  Dr. Chambliss testified that there was evidence of healing and reinjury, which indicates that the rib injuries could have occurred on two separate occasions.  Some of Roman's ribs could have been broken three to five days before he died.  This testimony adequately supports a finding that appellant broke some of Roman's ribs on or about November 16, 2006, as alleged in the information.

In addition, even if a fact finder were to conclude that appellant broke Roman's ribs close to the time he fractured Roman's skull, the rib injuries are not necessarily part of a single course of conduct. Appellant's acts of smashing Roman's skull and breaking baby's ribs were separate acts of violence. They do not necessarily evidence a single intent and objective. (*People v. Trotter* (1992) 7 Cal.App.4th 363, 368 [three shots fired at pursuing police officers were three separate acts for purpose of section 654].)

For both of these reasons, we conclude that section 654 does not require stay of the sentence imposed on count 2.[9]

## DISPOSITION

The judgment is affirmed.

_____<br>
LEVY, Acting P.J.

WE CONCUR:


_____<br>
POOCHIGIAN, J.


_____<br>
FRANSON, J.

---

[9]      Appellant also raises a claim of cumulative error. Since we have not found any individual errors, this final contention necessarily fails.